Filed 6/28/13  P. v. Norman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C065028 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F03198) |
| v. | |
| DANIEL JAMES NORMAN, | |
| Defendant and Appellant. | |

A jury found defendant Daniel James Norman guilty of first degree murder and burglary.  The trial court sentenced him to 25 years to life in state prison for the murder and stayed a six-year prison term for burglary.  (Pen. Code, § 654.)  Defendant timely filed this appeal.

On appeal, defendant contends the trial court erred when it permitted the People to admit evidence of statements made by him during two police interrogations.  Defendant argues he was in custody during the first interrogation but had not received the warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).  He contends the *Miranda* warnings he received before the second interrogation were inadequate.  We disagree and shall affirm the judgment.

1

# FACTUAL AND PROCEDURAL BACKGROUND

*Summary of Evidence at Trial*

On April 20, 2008, 76-year-old Wilbur Reynolds's home was set on fire. Reynolds's dead body was found on a bed with his wrists tied behind his back. He had been shot in the head, beaten, and burned, and his home had been ransacked.

A neighbor provided a partial license plate of a Jeep--registered to defendant--seen leaving Reynolds's home. Law enforcement learned that David Hamilton, a parolee at large, had been involved in a dispute with a female living at Reynolds's home and that Hamilton and defendant lived in the same apartment complex.

After detectives (who were watching defendant's residence) saw defendant return home in the Jeep, they had two separate conversations with defendant in the home; the second resulted in his accompanying officers to the sheriff's station, where detectives questioned him in the early morning of April 21 and later at the county jail on April 22, 2008. The jury heard recordings of the sessions. Defendant made inconsistent statements concerning a variety of topics related to Hamilton and Reynolds.

Dannell Cameron testified that on April 20, 2008, she was at the Heritage Inn with defendant and Hamilton. The men carried three or four duffle bags into her room. The bags contained jewelry, coins, watches, and other items belonging to Reynolds.

*Motion to Suppress Statements*

In the trial court, defendant moved to exclude his statements made while at the sheriff's station on April 21 and at the county jail on April 22, 2008. Defendant argued the April 21 interrogation should be excluded because he was in continuing custody-- from the time that he was ordered out of the shower by officers the previous evening--and had not been advised of his *Miranda* rights, and that the April 22 interrogation had not been preceded by adequate *Miranda* warnings. The trial court rejected both arguments and denied the motion.

# DISCUSSION

Defendant renews both arguments on appeal. We address his claims about each interrogation separately.

## I

### *Defendant's First Interrogation*

#### A.     *Testimony at the Hearing*

At the hearing on defendant's motion to suppress, detectives testified they learned that Hamilton, a parolee at large, had a domestic violence dispute with a female staying with Reynolds, and that Reynolds's family had reported that someone was stealing from him. They also knew at least one witness had seen a Jeep Cherokee, registered to defendant, leaving the scene, and another person running across the street and getting into the Jeep. They also knew that Hamilton and defendant lived in the same apartment complex.

On April 20, 2008, about 8:20 p.m., law enforcement began watching defendant's apartment. At some point after 9:15 p.m. but before 10:30 p.m., defendant arrived in his Jeep and went inside. Several detectives and other officers, wearing holstered guns and vests bearing a sheriff's logo knocked on defendant's door at around 10:30 p.m. Defendant's brother, Tom Norman, invited them in, after they said they wanted to talk to defendant. Tom Norman said defendant was upstairs taking a shower and that they could go up and talk to him.

Detectives Kevin Reali and Rob Patton went upstairs, knocked on the bathroom door, announced they were from the sheriff's department, and asked defendant to come out so they could talk to him. Defendant got out of the shower, but stayed partially behind the bathroom door while putting on his underwear, during which time he was "fidgeting," as if he might be hiding something. Defendant put on his pants and the detectives asked him where they could talk to him. Defendant said they could talk in his

3

bedroom. Reali looked for weapons but did not find any, though he did find narcotics and syringes.

Defendant seemed nervous, so Patton told him, "[This] is just going take a second. We're not here for you. You're not in trouble. We're here for somebody else." The detectives said they were looking for Hamilton because he was a parolee at large and they showed him Hamilton's picture. Defendant said he had dropped off Hamilton at the Heritage Inn about an hour earlier.

Detective Elaine Stoops arrived at the home at approximately 11:30 p.m. and also spoke with defendant in his bedroom. Stoops described defendant as being "very calm" and "very cooperative." Stoops explained that they were conducting an investigation and "we hoped he would come down to our Orange Grove office to talk to us." She further stated that he would be given a ride back home, that "he wasn't under arrest or anything, and that we hoped he'd speak with us." Defendant agreed. Hamilton's former girlfriend, Jerrie Beede, was present and also agreed to go to the station.

While defendant and Beede were transported to the sheriff's station, neither was handcuffed and detectives had displayed no weapons. At the station, both were allowed to smoke cigarettes in the parking lot before being taken inside, where they were placed in separate interview rooms.

During defendant's interrogation, which lasted over five hours, detectives Newton and Stoops questioned defendant to establish a timeline as to his activities and contacts that day. Defendant was repeatedly told that he was not under arrest and that the detectives wanted to find out more about Hamilton. He was advised many times to tell the truth and not try to cover up for anyone, as he appeared to be doing.

Defendant was not arrested until his interview was completed and after the interview with Cameron concluded. His arrest was based upon information she provided.

4

## B. Trial Court's Findings After Hearing

The trial court found the detectives' testimony credible as to their actions and the actions of the suspects. Although it observed that the detectives "saw [defendant] as a more serious suspect from the beginning," it added "that isn't the test." Articulating the test as whether law enforcement treated defendant in such a way that he was not subjected to custodial interrogation, the trial court answered in the affirmative. The officers spoke with defendant in his own residence because it was a comfort zone for defendant. When defendant was asked if he would go with the officers, defendant did not believe he was in custody, instead he thought he could "talk his way out of this" by telling them that "he just knows Hamilton" and would be willing to help the officers if he could do so. Defendant was not handcuffed, no weapons had been drawn, he was not frisked, and he "never tested" the officers on whether he was free to leave. There was "no pressure applied" by the officers, they were not "aggressive," "confrontational," or "accusatory." Hence, the trial court found defendant was not in custody during the first interrogation.

## C. Analysis

Defendant argues that from the time he was confronted by the officers at night in the shower until his time of his formal arrest, about seven hours later, his movements were "severely restricted." During the interrogation, although the officers initially questioned him about Hamilton, they then narrowed their questioning to defendant's activities to the point that showed their focus "had clearly shifte[d] from witness to suspect." Further, the officers became accusatory by repeatedly telling him that they knew the answers and that he should tell the truth. From the foregoing, defendant concludes that a reasonable person in his position would not believe "he was free to terminate the encounter with the officers." We disagree.

"'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a

5

defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave" [citation].'" (*People v. Moore* (2011) 51 Cal.4th 386, 395.) "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question of whether the individual is in custody for purpose of *Miranda*." (*Stansbury v. California* (1994) 511 U.S. 318, 324 [128 L.Ed.2d 293, 299] (*Stansbury*).)

As to the questioning of defendant at his home, we note that a defendant's home is a "noncustodial setting." (*People v. Storm* (2002) 28 Cal.4th 1007, 1013.) As to the detectives confronting defendant in the shower at night, although the record is unclear as to *precisely* when detectives first contacted defendant in the shower, it was no later than 10:30 p.m., was most likely earlier, and was no more than about an hour after defendant had arrived home. This does not strike us as so late as to be threatening, particularly given the late hour of defendant's arrival at the home.

Nor were the detectives threatening in their behavior. They asked if defendant would speak to them, and asked him to put on his pants. Defendant chose to be questioned in his bedroom.

That the atmosphere was noncoercive was further demonstrated by Patton's telling defendant he was not in trouble and that they were looking for someone else, Reali's fetching defendant's T-shirt from the bathroom at defendant's request, and Stoops's explaining to defendant that the officers were conducting an investigation, he was not under arrest, they "hoped" he would come down to the police station and talk to them, and that afterward he would be given a ride home. The lack of a coercive atmosphere

6

continued when defendant and Beede were taken to the police station. The detectives permitted the two to smoke before the interrogations commenced, did not at any time draw their guns, and did not search or handcuff the two.

As for the interrogation itself, even assuming that the detectives considered defendant to be a suspect in the homicide, as we have noted *ante*, a "subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question of whether the individual is in custody for purposes of *Miranda*." (*Stansbury*, *supra*, 511 U.S. at p. 324.)

Here, the detectives were questioning defendant extensively on his activities throughout the day because, as they explained to him, they were trying to establish a timeline of his activities, to verify the truth of his statements. They admonished him to tell the truth and not cover up for Hamilton, and he was repeatedly told that he was not under arrest. At no time during the April 20-21 interview or the suppression hearing did defendant ever claim he felt he was not free to discontinue the interview and leave.

Finally, *People v. Aguilera* (1996) 51 Cal.App.4th 1151 (*Aguilera*), relied on by defendant, is factually distinguishable. Aguilera was found to be in custody because an officer explained that the interrogation would end *after* he told them the truth. The officers repeatedly rejected Aguilera's story, and told him that he would not be allowed to leave if they had to interview an alleged alibi witness. (*Aguilera, supra,* 51 Cal.App.4th at pp. 1163-1164.) "The 'tag team' interrogation" was "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating." (*Aguilera, supra,* at pp. 1164-1165.) The circumstances herein are not at all like those of *Aguilera.*

On the facts found by the trial court, defendant was not in custody during the April 21, 2008, interrogation.

## II

### Defendant's Second Interrogation

*A.      Testimony at the Hearing*

Detectives Stoops and Newton questioned defendant on April 22, 2008 at the jail. Newton informed defendant: "You have the right to remain silent[;]" "Anything you say may be used against you in court[;]" "You have the right to the presence of an attorney before and during questioning[;]" and "If you cannot afford an attorney, one will be appointed for you free of charge before any question if you want." Defendant said he understood each right.

*B.      Trial Court's Findings*

The trial court found that the advisement to defendant outlined above "fully complies with the Miranda requirement . . . ."

*C.      Analysis*

On appeal, defendant reiterates his claim in the trial-court that the *Miranda* warning was inadequate, because detective Newton advised defendant that his statements "may" rather than "can and will be" be used against him. According to defendant, the difference is critical because, using "may" rather than "can and will" was "too tentative to convey the extent of the rights that he was waiving and thus . . . he could not understand what he was doing sufficiently to make an informed decision and a voluntary waiver." Defendant provides *no* authority supporting this claim, but relies on the general rule that the advisements must fully explain the rights being waived. (See, e.g., *United States v. Noti* (9th Cir. 1984) 731 F.2d 610, 614-615 [failure to advise of right to counsel during questioning was error].)

As explained by the United States Supreme Court:

"We have never insisted that *Miranda* warnings be given in the exact form described in that decision.[fn.] In *Miranda* itself, the Court said that 'the warnings required and the waiver necessary in accordance with our opinion today are, *in the*

8

*absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant.' [Citations.] In *California v. Prysock* (1981) 453 U.S. 355 [69 L.Ed.2d 696] (per curiam), we stated that 'the "rigidity" of *Miranda* [does not] extend to the precise formulation of the warnings given a criminal defendant,' and that 'no talismanic incantation [is] required to satisfy its strictures.'" (*Duckworth v. Eagan* (1989) 492 U.S. 195, 202-203 [106 L.Ed.2d 166].)

Our Supreme Court has echoed this view:

"[T]he *Miranda* warnings are 'prophylactic' [citation] and need not be presented in any particular formulation or 'talismanic incantation.' [Citation.] The essential inquiry is simply whether the warnings reasonably '"[c]onvey to [a suspect] his rights as required by *Miranda*."'" (*People v. Wash* (1993) 6 Cal.4th 215, 236-237.)

In particular, *Miranda* itself held: "Prior to any questioning, the person must be warned . . . that any statement he does make *may* be used as evidence against him." (*Miranda*, *supra*, 384 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707], italics added.)

The United States Supreme Court in *Miranda* considered the use of "may" as sufficient to advise the defendant of the risk he took in choosing to speak with law enforcement. We see no basis to disagree, even were we able to do so.

## DISPOSITION

The judgment is affirmed.

                                                    DUARTE            , J.

We concur:

            RAYE               , P. J.

            MURRAY           , J.