[No. H013728. Sixth Dist. Dec. 19, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH AGUILERA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and V.

**COUNSEL**

Sheila B. Cohen and Michael A. Kresser, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WUNDERLICH, J.—**

## I. *Statement of the Case*

Defendant Joseph Aguilera appeals from a judgment entered after a jury convicted him of involuntary manslaughter and conspiracy to commit battery and to fight or challenge to fight in public. (Pen. Code, §§ 192, subd. (b), 242, 415, subd. (1).)[1] The jury also found true enhancement allegations that defendant committed both offenses while armed and that he did so for the benefit of a "criminal street gang." (§§ 186.22, 12022, subd. (a).)

On appeal defendant claims there is insufficient evidence to support either conviction. He claims his statements to police were involuntary and obtained

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

in violation of the *Miranda*[2] rule. He claims the court erred in admitting extrajudicial statements by coparticipants, refusing proposed instructions on how to determine whether the killing was a natural and probable consequence of his criminal conduct, instructing the jury that the instant offenses could establish the "pattern" element of the gang enhancement, and instructing the jury that scienter is not an essential element of the arming enhancement. Finally, assuming a scienter requirement, defendant argues there is insufficient evidence to support the arming enhancement.

We agree that defendant's statements were obtained in violation of the *Miranda* rule and conclude that their admission at trial compels reversal.

## II. *Facts*[3]

On January 27, 1994, a group of Norteños went to the Washington Elementary School in San Jose, and one of them shot Osvaldo Mojarro Rios to death.

Sometime before the killing, the group, travelling in a caravan, drove by the residence of Jesus Mesa and his family on Lotus Street in San Jose. One family member yelled "Sureño" to the passing vehicles and then ran into the house. The caravan turned around and stopped. Three Norteños walked up the driveway, yelling "Norteño." One had a gun. Another took out a knife and slashed tires on cars in the driveway. Another picked up a car bumper, which was on the ground, and tossed it through a window of the house. Thereafter, all three ran back to their cars and sped off. Two members of the Mesa household chased after them with bats.

Chris Barajas, a Sureño, testified that he saw three vehicles at a restaurant and heard the occupants yell "fourteen" and "Norte" at him and a friend. Later, he and Guadalupe Banda, also a Sureño, were standing outside the Washington Elementary School, which, according to Banda, is a Sureño area. Barajas noticed the same vehicles he had seen earlier. The vehicles stopped, and the occupants got out. They yelled "Norte" and gang initials.

---

[2]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[3]The prosecution presented considerable evidence to show that the killing was gang related and to prove the gang enhancement allegations. Given our reversal of the convictions, we need not recount all of this evidence. We refer to it as necessary in discussing certain issues. Now, we note only Officer Michael Piscitello's testimony that there are two basic types of Hispanic gangs: Norteño and Sureño. Norteño gang members are usually born in San Jose and identify with Northern California, the color red, and the number 14. Sureño gang members are usually born in Mexico and identify with Southern California or Mexico, the color blue, and the number 13. The two types of gangs hate each other and express this by provocative hand signs, challenges, *physical* confrontations, stabbings, and shootings.

Some stood near a Buick Regal, and others ran toward Barajas and Banda who fled and heard gunshots.

Daniel Medina saw the three vehicles near the Regal. Someone in a white car yelled "Norte" and "fourteen." A man got out, held up a gun for others to see, and rapidly fired five or six shots into the Regal.

Stephanie Navarrette and the victim were parked in front of the school waiting for their six-year-old son. She said that a small white car pulled up and the passenger asked Rios, " '[W]hat's up?' " Rios said " '[W]hat? I don't even know you' " and rolled up the window. Navarrette saw a gun, then ducked and heard several gun shots.

Steven Gonzalez, Jesus Badillo, Rafael Gudino, Marlon Mayorga, Manuel Villalvazo were interviewed by the police in connection with the shooting. They related that on January 27, they met with a group of Norteños and formed a caravan to look for Sureños to fight. Gonzalez described Sureños as the "enemy." Mario Abrego drove one of the cars in the caravan. Ramon Montes said he brought the murder weapon with him. Several described chasing Sureños before heading to the Washington Elementary School. Some also described the incident on Lotus Street. John Mendoza said that after they attacked, the Sureños there counterattacked with bats and machetes. Gonzalez said the group later congratulated the person who tossed the bumper through a window. All of those interviewed said the caravan went to the Washington Elementary School, chased a group of Sureños, and left when they heard gunshots. Badillo said that after the shooting, they regrouped and agreed not to talk about the incident.

The police also interviewed defendant. He initially denied being one of those in the Norteño caravan. He understood the difference between Norteños and Sureños, knew they did not get along, and he said had been attacked by Sureños because he looked like a Norteño. He was also aware of specific problems with Sureños in the Washington Elementary School area and said it was not unusual for Norteños to get together because "there's more Sureños around." He knew many Norteños in the West Side Mob, including Badillo, but denied being a gang member himself.

Ultimately, defendant admitted that he rode in the caravan but said he did not know many of the others. He explained that three cars came to pick him up from school. They went to Roosevelt Park and were joined by a fourth car. At first, he thought they were just looking for girls but he soon realized they were out "gangbanging" Sureños. He described how they would pull up to cars and yell "Norteño." He admitted he tried to "fit in" and would switch seats with others among the cars.

Defendant described the Lotus Street incident and said he too got out of his car. From there, the group stopped at a restaurant and then found and confronted some other Sureños. The caravan separated, regrouped, and drove to the Washington Elementary School because someone had seen a group of Sureños there. As his car passed the school, some Sureños started walking away. His car stopped, and he and the others got out.

He saw the victim and a woman in a parked car and heard someone yell something like "San Jo Norte." The victim made an obscene finger gesture and said something like "fuck you, fuck Norte." Somebody yelled back "Norte" or "puro San Jose" or "San Jo Norte." He then saw a person from another car approach the victim and fire a gun. The group returned to their cars and fled. Defendant went to work.

Defendant told police he did not see a gun before the shooting but had heard somebody talk about one, saying it was "cheap" and "no good." He did not know where it was and "just thought somebody was like holding it or something" but did not know who.

### The Defense

The defense was based on evidence and argument that (1) defendant was a passive passenger in the caravan; (2) he thought they were just looking for girls; (3) when he realized the group's purpose, he did not intend to join them; (4) he did not chase any Sureños; (5) he did not know Francisco Valdez or anyone had a gun until the shooting; (6) he was not a gang member or associate; (7) the evidence relied upon by Officer Piscitello did not suggest defendant was involved in the shooting; and (8) he has a good, peaceful, and nonviolent character.

Gustavo Aceves, Javier Ceja, Sandra Burkitt, Joel Romero, and defendant's father testified concerning defendant's character for shyness, peacefulness, honesty, and nonviolence and to establish that he was not the type of person who would be in a gang or who would even be asked to join one.

### III. *Sufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . .

### IV. *Admission of Defendant's Statement*

Defendant contends the trial court erred in admitting evidence of the statements he made to Officers Torres and Sterner. He claims they were

---

*See footnote, *ante*, page 1151.

involuntary and/or obtained in violation of the *Miranda* rule. We agree with the latter claim.

## A. *Factual Background*

Officer Torres testified that she and her partner Officer Mike Sterner learned from Jessie Badillo that defendant was "involved" in the events of January 27. They went to defendant's residence and asked him and his mother if he would talk to them at the police station about the homicide. They offered to bring him back home. Defendant and his mother agreed that he would go. Defendant's mother also consented to a search of her house for evidence of the homicide and gang involvement.

The officers brought defendant to an interview room at the police station. Although he was not physically restrained, Officer Torres did not recall whether defendant ever left the room. The interview lasted two hours, and when it was over, the officers drove defendant back home.

Officer Torres told defendant he was not in custody. However, she then said they would bring him home when they were finished, explaining that "[i]t really depends on how, how long you want to take and how, how quickly you tell us the truth." Torres later testified that what she meant was that if defendant told the truth in one hour or two hours, the interview would take that long. She further explained, "There's a possibility that he would never tell us the truth, then we would give him a ride home without him telling us the truth." However, Torres admitted she did not tell this to defendant.

Torres next informed defendant they knew what had happened at the Washington Elementary School, who had been present, and who had done what. Officer Sterner said they just wanted to know how he got involved. Defendant denied being involved. He said that after school, he declined an invitation to join a group of people and instead walked home with Jesus Badillo. The officers rejected this story, calling it "bullshit" and accusing him of fabricating an alibi with Badillo. They told him not to "play games" and confronted him repeatedly with incriminating evidence of his involvement with "gangbangers." They falsely suggested they had his fingerprints from one of the cars.

Defendant continued to deny involvement. The officers became exasperated and annoyed and assailed him for hiding behind lies and not taking responsibility for his conduct. They warned that his lies would not protect him and that while the truth might exculpate him, his lies plus the evidence they had would probably lead to murder charges and his being labeled a liar.

Defendant nevertheless refused to admit involvement. The officers pressed on. They said other officers were with his mother, and she would not corroborate his story. They said his story might be an effort to conceal complicity in the murder. They asked him to think about family events (his sister's marriage) and personal opportunities (going to college) that he would miss if sent to prison. They said he owed the victim the real story and invoked his mother's guidance to tell the truth.

After a while, the officers decided to leave defendant alone for a while. Before leaving, they advised him to clear his conscience and not to waste any more of his or their time. When the interview resumed, defendant stuck to his story. The officers again said he was lying and continued to pressure him to tell the truth. They warned that "lying isn't gonna get you anything, nothing good. It'll sink you, but it ain't gonna save you." Torres advised him that "[i]f you tell us a lie and we know it's a lie, then that story is what's gonna get tacked onto you, and I can't protect you from that. Nobody can protect you from that."

After further pressuring, defendant partially abandoned his story. Asked if he intended to kill anyone while driving around, defendant said "no" and denied that the group was looking for Sureños. Sterner disbelieved him, asserting that that was the purpose. "That was stated clear and up-front." Defendant denied he intended to get involved if there was fighting and said he thought the group was out looking for girls. Sterner said others had given this story, but he did not believe it. Defendant then said he just wanted to cruise around with the group but soon realized they were out to "gangbang" Sureños. Defendant said they drove around, stopped at a few places, and got involved in some incidents with Sureños. He denied seeing a gun but admitted hearing someone mention that somebody else had a gun and that it was "no good."

Defendant then said that after the group left a Wendy's restaurant, he left them to go with a girl he had seen. Sterner responded, "[Y]ou know [how] this is gonna work. You're gonna tell us some girl's name. *We're not gonna let you leave* here until we go talk to the girl, and she's not gonna be able to confirm the story, Joe." (Italics added.) He then pressed defendant to tell him about the incident at Washington Elementary School. At that point, defendant dropped all resistance and explained what happened that day.

### B. *Custodial Interrogation*

In *Miranda* v. *Arizona, supra*, 384 U.S. 436, the United States Supreme Court held that a person questioned by the police after being "taken

into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Id.* at p. 444 [16 L.Ed.2d at pp. 706-707].) Statements obtained in violation of this rule cannot be used to establish guilt. (*Ibid.*)

It is settled that the *Miranda* advisements are required only when a person is subjected to "custodial interrogation." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706]; *People* v. *Mickey* (1991) 54 Cal.3d 612, 648 [286 Cal.Rptr. 801, 818 P.2d 84].) "Custodial" means "any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (*Mickey, supra,* 54 Cal.3d at p. 648, quoting *Miranda, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) Interrogation "'refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (*Mickey, supra,* 54 Cal.3d at p. 648, quoting *Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682].)

It is beyond reasonable dispute that defendant's interview was reasonably likely to elicit incriminating responses and thus was "interrogation" within the meaning of the *Miranda* rule. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 648; cf., e.g., *People* v. *Rucker* (1980) 26 Cal.3d 368, 386 [162 Cal.Rptr. 13, 605 P.2d 843]; *People* v. *Stewart* (1965) 236 Cal.App.2d 27, 32, 33 [45 Cal.Rptr. 712].) The People do not claim otherwise.

The primary issue is whether defendant was "taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) To make this determination, a trial court must first establish the circumstances surrounding the interrogation. It must then measure these circumstances against an objective, legal standard: would a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest. (See *Berkemer* v. *McCarty* (1984) 468 U.S. 420, 442 [82 L.Ed.2d 317, 336, 104 S.Ct. 3138]; *California* v. *Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279-1280, 103 S.Ct. 3517]; *People* v. *Stansbury* (1995) 9 Cal.4th 824, 830 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

On appeal, we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was "custodial." (*TRW, Inc.* v. *Superior Court* (1994) 25

Cal.App.4th 1834, 1851-1852 [31 Cal.Rptr.2d 460]; see *Thompson* v. *Keohane* (1995) 516 U.S. __ [133 L.Ed.2d 383, 116 S.Ct. 457] [construing standard of review for federal habeas corpus proceedings].)

■ Courts have identified a variety of relevant circumstances. Among them are whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation. (See *People* v. *Stansbury, supra,* 9 Cal.4th at pp. 831-832; *People* v. *Lopez* (1985) 163 Cal.App.3d 602, 608 [209 Cal.Rptr. 575]; *People* v. *Spears* (1991) 228 Cal.App.3d 1, 25 [278 Cal.Rptr. 506]; *U.S.* v. *Griffin* (8th Cir. 1990) 922 F.2d 1343, 1348.)

No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest. (See *People* v. *Boyer* (1989) 48 Cal.3d 247, 272 [256 Cal.Rptr. 96, 768 P.2d 610].)

We find helpful guidance in three cases. In *Green* v. *Superior Court* (1985) 40 Cal.3d 126 [219 Cal.Rptr. 186, 707 P.2d 248], the defendant voluntarily accompanied officers to the station for an interview. The officers considered him a very important witness. They questioned him in a locked room, although there was no evidence the defendant knew it was locked. They did not say whether he was under arrest but did say he could leave if he wanted to. The interview was detailed but not accusatory in nature. The defendant was at the station for more than two hours because the interview was interrupted. Our Supreme Court concluded under these circumstances, a reasonable person would not have felt in custody during the interview. (*Id.* at pp. 131-135)

In *People* v. *Spears, supra,* 228 Cal.App.3d 1, the police briefly questioned the defendant at his home and then, with his consent, at the station.

The interview lasted an hour and a quarter. (*Id.* at pp. 21-22, 26.) Although the questions were extensive and at one point the officers asked if the defendant killed the victim, the officers were "courteous and polite" and did not threaten or intimidate the defendant, lead him to believe that he was a suspect in the murder, say they considered him to be guilty, or indicate they had the evidence to prove his guilt in court. (*Id.* at p. 25.) Moreover, they told the defendant at various times he was free to leave, and when they asked for consent to search his residence, he felt free enough to refuse. (*Id.* at p. 26.) Citing *Green*, this court found that the defendant was not in custody during the station house interview.

Finally, in *People* v. *Boyer, supra,* 48 Cal.3d 247 the defendant apparently consented to an interview at the police station. (*Id.* at pp. 264, 268.) Once in the interrogation room, the police "*Mirand*ized" him. (*Id.* at p. 264.) Thereafter, they subjected the defendant to an intense interrogation for almost two hours. The officers used both softening-up tactics and aggressive, directly accusatory questions. They told him they knew he was guilty, intended to charge him, and had evidence to prove his guilt in court. They wanted to know "why" he had committed the homicide to establish his degree of culpability. (*Id.* at pp. 264-265, 268.) The officer also evaded questions about whether he was under arrest. (*Id.* at p. 265.) On these facts, the court concluded that a reasonable person would have felt effectively under arrest during the interview.[6] (*Id.* at pp. 268, 272; see also, e.g., *People* v. *Esqueda* (1993) 17 Cal.App.4th 1450 [22 Cal.Rptr.2d 126]; *U.S.* v. *Griffin, supra,* 922 F.2d 1343; *United States* v. *Wauneka* (9th Cir. 1985) 770 F.2d 1434.)

 Here, defendant agreed to an interview at the station, and Officer Torres initially said defendant was not in custody. However, we find it significant that Torres then explained that the interview would end and they would bring him home *after* he told them the truth. Given the officers' repeated rejection of defendant's story, a reasonable person eventually would have realized that telling the "truth" meant admitting the officers' information was correct and explaining how and why one was involved and that until this "truth" came out, he or she could not leave. The officers later expressly reinforced this implication by explicitly telling defendant he would *not* be allowed to leave if they had to go interview an alleged alibi witness.

---

[6]The *Boyer* court observed, among other things, that "*Mirand*izing" the defendant indicated that "the officers themselves believed the situation might be tantamount to custody." (48 Cal.3d at p. 268.) In *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1115 [269 Cal.Rptr. 530, 790 P.2d 1327], the court found the interrogation noncustodial, noting, among other things, that unlike *Boyer*, no *Miranda* advisement was given. In *People* v. *Stansbury, supra,* 9 Cal.4th at page 830, footnote 1, the court disapproved *Boyer* and *Holloway*, among others, for suggesting that an officer's *uncommunicated* belief during an interrogation is relevant on the issue of custody. The court explained that such beliefs are relevant only if the officer makes them manifest to the suspect.

Next, we note that unlike the officers in *Green* and *Spears*, Officers Torres and Sterner did not tell defendant he was free to terminate the interview and leave if he wished.[7] (See also, e.g., *U.S.* v. *Griffin, supra*, 922 F.2d at pp. 1349-1350.) Furthermore, unlike the defendant's refusal to consent to a search in *Spears*, defendant's conduct here does not indicate he was aware of his personal rights during the interrogation. Indeed, it does not appear that defendant ever left the interview room, and Torres could not recall whether defendant ever did. Nor does it appear defendant had a means of getting home on his own if he had tried to leave before the officers were finished with him. (See *Green* v. *Superior Court, supra*, 40 Cal.3d at p. 136.)

We observe that the officers did not interview defendant only as a potential witness. (See, e.g., *People* v. *Stansbury, supra*, 9 Cal.4th at pp. 831-832 [finding this fact significant and indicative of noncustodial interrogation].) Unlike the officers in *Green* and *Spears*, the officers here unmistakably informed defendant he was a potential suspect and repeatedly told him they had evidence to prove his involvement. (Also compare with *People* v. *Holloway, supra*, 50 Cal.3d at p. 1115 [defendant was not led to believe he was focus of investigation].) The People candidly concede that defendant was made aware "that the police officers fully suspected the worst possible scenario regarding [his] involvement in the crime."

█ Concerning the manner of interrogation, this court opined in *People* v. *Lopez, supra*, 163 Cal.App.3d at page 608, footnote 4, that "[a]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave" than would general and neutral investigative questions. Thus, on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory. (See, e.g., *People* v. *Stansbury, supra*, 9 Cal.4th at pp. 831-833; *People* v. *Holloway, supra*, 50 Cal.3d at p. 1115; *People* v. *Morris* (1991) 53 Cal.3d 152, 197-198 [279 Cal.Rptr. 720, 807 P.2d 949]; *Green* v. *Superior Court, supra*, 40 Cal.3d at pp. 131-135; *People* v. *Forster* (1994) 29 Cal.App.4th 1746, 1754 [35 Cal.Rptr.2d 705]; *In re Victor B.* (1994) 24 Cal.App.4th 521, 524 [29 Cal.Rptr.2d 362]; *People* v. *Bellomo* (1992) 10 Cal.App.4th 195, 199 [10 Cal.Rptr.2d 782]; *People* v. *Spears, supra*, 228 Cal.App.3d at p. 25; *People* v. *Celaya* (1987) 191 Cal.App.3d 665, 672 [236 Cal.Rptr. 489].)

█ The interrogation here was akin to that in *Boyer* and distinctly different from those in *Green* and *Spears*. The "tag team" interrogation

---

[7]We do not suggest that police must give such advice. However, where, as here, a suspect repeatedly denies criminal responsibility and the police reject the denials, confront the suspect with incriminating evidence, and continuously press for the "truth," such advice would be a significant indication that the interrogation remained noncustodial.

lasted two hours and was intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating. Although the officers' tactics and techniques do not appear unusual or unreasonable, we associate them with the full-blown interrogation of an arrestee, and except for a *Miranda* advisement, we cannot conceive how defendant's interrogation might have differed had he been under arrest.

Given the totality of circumstances, we conclude that at least by the time defendant partially abandoned his story, if not before, the environment during the interrogation had become coercive, and a reasonable person would have understood he or she was required to remain for questioning indefinitely at the sole discretion of the officers and was not free to leave until he or she satisfied the officers' demand for the truth. Thus, a reasonable person would have felt deprived of liberty in a "significant way" and that the restraint was tantamount to being under arrest. (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].)

■ We acknowledge that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon* v. *Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711].)

■ Nevertheless, the circumstances here are not comparable to a traffic stop (see, e.g., *Berkemer* v. *McCarty, supra,* 468 U.S. at pp. 435-440 [82 L.Ed.2d at pp. 331-335]) or a *Terry*[8] stop—i.e., a temporary detention for investigation (see, e.g., *People* v. *Vasquez* (1993) 14 Cal.App.4th 1158, 1163 [18 Cal.Rptr.2d 277]). Generally, the *Miranda* rule is inapplicable in these situations because the restraint on liberty often occurs in a nonthreatening or noncompulsive public environment and its duration is limited. (See *People* v. *Lopez, supra,* 163 Cal.App.3d at p. 607; *People* v. *Montoya* (1981) 125 Cal.App.3d 807, 810 [178 Cal.Rptr. 211].) "Questioning under these circumstances is designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and thus enable the police to quickly ascertain whether such person should be permitted to go about his business or held to answer charges." (*People* v. *Milham* (1984) 159 Cal.App.3d 487, 500 [205 Cal.Rptr. 688].)

■ Here, however, the interview was a typical custodial interrogation, during which the suspect "feels completely at the mercy of the police,"

[8]*Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].

"which frequently is prolonged, and in which the [suspect] is aware that questioning will continue until he provides his interrogators the answers they seek." (*Berkemer* v. *McCarty*, *supra*, 468 U.S. at p. 438 [82 L.Ed.2d at p. 333].)

The People argue that because the officers told defendant he was not in custody and said he would be brought home, a reasonable person could not have felt deprived of freedom in a significant way during the interview. (*Miranda* v. *Arizona*, *supra*, 394 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707].) We are unpersuaded.

The People downplay the significance of Officer Torres's statement to the effect that the interview would end and defendant would be brought back home only after he told them the truth. Moreover, the People cite no cases in which the circumstances they emphasize negated the coercive circumstances present in this case.

As discussed, these circumstances constituted "custodial interrogation" and triggered the duty to give *Miranda* advisements. In the absence of these advisements, defendant's statements were inadmissible. Thus we turn to the issue of prejudice.[9]

■ We review *Miranda* error under the "harmless beyond a reasonable doubt" standard propounded in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 32 [23 Cal.Rptr.2d 593, 859 P.2d 673].) In *Yates* v. *Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884], the United States Supreme Court explained that "[t]he *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Yates* v. *Evatt*, *supra*, 500 U.S. at pp. 402-403 [114 L.Ed.2d at p. 448].) "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question . . . ." (*Id.* at p. 403 [114 L.Ed.2d at p. 449].)

■ The People do not claim that the admission of defendant's statements was harmless error. This is understandable. The statements are the most compelling evidence of his guilt. They establish defendant's knowledge of Norteño-Sureño animosity and conflict, the previous attack on him by Sureños, his awareness that others in the group were gang members, his knowledge that its purpose was to "gangbang" Sureños, his conduct during

---

[9]Under the circumstances, we need not address defendant's alternative claim that the officers' conduct rendered his statements involuntary.

the caravan and at various locations, and his presence at Washington Elementary School. Indeed, our conclusion that there is sufficient evidence to support defendant's convictions rests primarily on defendant's statements. Under the circumstances, we cannot find defendant's statements "unimportant" in relation to the prosecution's other evidence. Nor can we conclude beyond a reasonable doubt that their admission did not materially contribute to the jury's verdict.

## V. *Remaining Contentions**

. . . . . . . . . . . . . . . . . . . . . . . . .

## VI. *Disposition*

The judgment is reversed.

Premo, Acting P. J., and Elia, J., concurred.

---

*See footnote, *ante*, page 1151.