Filed 11/12/15  P. v. Dilley CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040167 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS110932A) |
| v. | |
| SUSAN DILLEY, | |
| Defendant and Appellant. | |

A jury convicted defendant Susan Dilley of one count of embezzlement (Pen. Code, § 503).[1]  She was sentenced to a total term of three years in county jail.  On appeal, she argues that statements she made to an investigating police officer should have been suppressed because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Alternatively, she argues that her statements were not obtained voluntarily.  Furthermore, she claims that her restitution fine of $840 must be reduced to $600.  She also requests that this court review the transcript of the in camera hearing conducted under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

We conclude the statements made by defendant to the police officer should have been suppressed, because they were obtained in violation of *Miranda*.  Furthermore, the failure to suppress these statements was prejudicial error.  We also conclude that we are unable to conduct a meaningful review of the in camera *Pitchess* hearing, because the present record is inadequate.  We reverse the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint*

On August 3, 2011, the Monterey County District Attorney's Office filed an amended complaint charging defendant with one count of embezzlement over $400 (§ 508).[2] It was further alleged that in the commission of the embezzlement, defendant took, damaged, and destroyed property of a value exceeding $200,000 within the meaning of section 12022.6, subdivision (a)(2).

The jury trial commenced on June 24, 2013.

*Evidence at Trial*

Jerry Anderson leased the Blanco Street Shell gasoline station (Blanco Shell), from Peninsula Petroleum. Defendant managed the station.

Anderson testified that records were maintained to keep track of shortages in the station's gasoline inventory. The gas tanks at the Blanco Shell station were double-walled; consequently, if the first tank leaked the second tank would capture the escaping gasoline. There were also sensors in place to detect leaks. Between 2009 and 2011, there were no detected gas leaks at the Blanco Shell station.

As the station's manager, defendant was responsible for maintaining business records, including a handwritten daily book that logged the sales of fuel and merchandise. The daily book tracked the fuel inventory in the beginning of the day, the amount of fuel delivered by the station's supplier, the amount of fuel sold that day, and the actual amount of fuel left in the gas tank determined by measuring the liquid in the tank. Defendant turned in her handwritten records at the end of every month.

---

[2] On September 19, 2012, the district attorney filed an amended information changing this count to a violation of section 503.

2

In addition to the handwritten records prepared by defendant, there were some electronic records of fuel sales. Purchases were recorded on a software system that collected information about fuel sales from the pumps.

Further, the amount of fuel delivered to the station was measured by delivery drivers. A driver delivering fuel would issue a ticket reflecting a "stick reading" taken by measuring the amount of fuel in the tank after delivery. The delivery driver also had a bill of lading that showed the gross and net amount of fuel delivered. The gas tanks themselves were monitored by another system that measured the volume of gas in each tank.

In early 2011, Anderson was notified by his bookkeeper, Sylvia Lackore, that there were discrepancies with the amount of profit generated by the Blanco Shell station. For some reason, the station's percentage of profit statistic was lower than the other stations that Anderson operated. Anderson went to the Blanco Shell station and talked to defendant, who showed him reconciliation reports. Defendant told Anderson she did not know why there was an apparent gas shortage. Based on the reports, Anderson immediately determined there appeared to be a leak.

Anderson called the owners of Peninsula Petroleum, which sent out an inspector to the gas station. The inspector's conclusion was that someone was stealing from the Blanco Shell station, because it was "very unlikely" that the gas tanks were leaking underground or that the measurements were inaccurate.

Defendant told Anderson that she did not report the shortages earlier because she thought they were within the overall criteria of overages and shortages. Defendant suggested to Anderson that the company delivering gas to the station could be shortchanging them. She did not provide any other explanation for the gas shortage.

3

Anderson testified that between 2010 and 2011 he did not actively review the gas station's records to check for shortages. He began his own internal investigation into the matter, and eventually contacted the police, in March 2011.

Sherri Anderson, Anderson's daughter, had previously been employed as a manager for one of Anderson's gas stations.[3] Sherri searched Blanco Shell for records but was unable to find paperwork including the record of fuel sales, which had been removed from the cash register printouts. Sherri testified that much of the missing paperwork was important for a manager of a gas station to have on hand.

Blanco Shell used Service Station Computer Systems (SSCS) software, which electronically recorded the point of service register system. SSCS had retained some of Blanco Shell's records for (1) 99 days in 2009; (2) between May 26, 2010, to July 30, 2010, and (3) between December 8, 2010, to March 17, 2011. Comparing the data received from SSCS and various other logs, it was estimated that gas sales had been underreported in the handwritten daily books prepared by defendant. One estimate was that the written daily books failed to report gas sales worth approximately $6,011 in December 2010, $10,220 in January 2011, and $6,079 in February 2011. Another estimate was that gas sales had been underreported by approximately $22,000 from December 2010 through February 2011, and by over $8,000 for May 2010 through July 2010. An employee at SSCS compared the written daily book to the logs prepared by his company, and found that gas sales were underreported by approximately $21,115 between December 8, 2010 and March 17, 2011, $29,809 between April 26, 2010, to April 12, 2011, and $8,879 between February 11, 2009, to May 20, 2009.

Defendant was interviewed by Salinas Police Officer James Knowlton on May 12, 2011. Knowlton first asked defendant to write down anything she knew about the theft of

_____

[3] We refer to Sherri using her first name for clarity, because she shares the same surname as her father.

money or fuel from the Blanco Shell station. Defendant's written statement asserted she did not know anything about the theft.

Later in the interview, defendant told Officer Knowlton that she had, in fact, made some changes to the handwritten daily books in order to reconcile the records. Defendant said she altered some entries, because she believed someone had been stealing from the store. Defendant said that all of the employees shared the cash register drawer, so it would be difficult to determine who was actually stealing the money. She told Knowlton that she did not tell Anderson about the discrepancies, because she was afraid he would fire everybody in the store.

At trial, the prosecution argued that during the interview with Officer Knowlton, defendant had made multiple misrepresentations, had minimized her actions, and had changed her story. The prosecution also asserted that defendant had access and ability to change the logs in the daily books and that she had initially told Anderson she believed there was a gas leak.

The defense argued that there were other employees who had access to the money that was stolen. Additionally, defendant herself was the one who furnished the records showing that there was a theft. There was no evidence that defendant was living beyond her means. Police had not investigated anyone else and had not examined any other employees' financial records.

*Verdict and Sentencing*

On the last day of the trial, defendant moved for a judgment of dismissal pursuant to section 1118.1. The motion was denied.

On June 28, 2013, the jury returned with a verdict, finding defendant guilty of committing embezzlement in violation of section 503. It further found the allegation under section 12022.6, subdivision (a)(1) to be true (that in the commission of the offense she took, damaged, or destroyed property of value exceeding $65,000), but the allegation

5

pursuant to section 12022.6, subdivision (a)(2) not to be true (that in the commission of the offense she took, damaged, or destroyed property of value exceeding $200,000).[4]

On September 13, 2013, the trial court sentenced defendant to two years in county jail for the embezzlement conviction. It imposed an additional year in county jail for the enhancement under section 12022.6, subdivision (a)(1), for a total of three years in county jail. The trial court ordered her to pay a $840 restitution fund fine under section 1202.4, subdivision (b). Defendant appealed.

## DISCUSSION

On appeal, defendant argues that her statements to Officer Knowlton should have been suppressed, because they were obtained in violation of her rights under *Miranda v. Arizona*. Alternatively, she claims that the statements were not voluntarily made. Furthermore, she insists that the restitution fund fine imposed by the trial court must be reduced. Lastly, she requests this court independently review the sealed transcript of the in camera hearing conducted on her *Pitchess* motion.

We find that reversal of defendant's conviction is necessary, because the court erred in denying her motion to suppress the statements she made during the interview with Officer Knowlton, and the admission of the statements was not harmless beyond a reasonable doubt. We also remand the matter to the trial court to conduct a new *Pitchess* hearing. Due to our reversal, we need not address her additional claim regarding her restitution fine.

---

[4] Section 12022.6, subdivision (a)(1) is a lesser included enhancement of section 12022.6, subdivision (a)(2). (See *People v. Cole* (2007) 156 Cal.App.4th 452, 456, fn. 4.) At the close of trial before closing arguments, the parties agreed to amend the charging information to include the enhancement under section 12202.6, subdivision (a)(1).

6

1. *Statements to Officer Knowlton*

    a. **Background**

Defendant was interviewed at the police station by Officer Knowlton in an interview room. Knowlton informed her that she could leave at any time, but that he was going to close the door, because the hallway noise could be distracting. Knowlton informed defendant that the door would remain unlocked during the interview. Defendant was not handcuffed or restrained. It is undisputed that she was not advised of her *Miranda* rights.

The interview lasted several hours. First, Officer Knowlton provided defendant with a piece of paper and a pen and asked her to write down anything she knew about the theft of money or fuel from the Blanco Shell station. Defendant's written statement asserted that she did not know anything about the theft. She claimed that the recorded amount of fuel delivered by the delivery company would sometimes be different than the actual amount received.

Defendant initially told Officer Knowlton that she had no information about the discrepancy in the daily books. She asserted that whatever loss was recorded was likely the result of mechanical or electronic problems.

Defendant later attributed the discrepancies between the gas station's financial records to an electrical power surge. She then explained that she thought someone was stealing, so she made changes to reconcile the books. Defendant told Officer Knowlton that she did not inform Anderson about the problem, because she did not want him to fire anybody. She also told Knowlton that all the employees share the cash register, so it would be difficult to determine who was stealing and that nobody had ever seen her take money out of the register.

Officer Knowlton acknowledged that he banged his hands on the table at least five or six times during the interview when she denied involvement in any theft. He also

7

called defendant a liar. Knowlton explained that he was trying to convey to defendant that he did not believe her story.

Toward the end of the interview, defendant told Officer Knowlton that she wanted to leave. Knowlton then told her she was not allowed to leave and arrested her. Defendant asked Knowlton why she was being arrested when Knowlton had initially told her she was free to leave at any time. He informed her that he had changed his mind based on the answers she had given during the course of the interview.

Officer Knowlton testified that the interview was supposed to be recorded, but due to an equipment malfunction the recording was never saved onto a hard drive.

During the preliminary hearing, Officer Knowlton testified regarding the circumstances of the interrogation. Defendant objected to the admission of the statements she made during the interview, arguing they were not made voluntarily and were obtained in violation of *Miranda*. The objection was overruled.

On November 7, 2011, defendant filed a motion to set aside the information under section 995. Defendant again argued that the statements should have been excluded, because they were not given voluntarily and were taken in violation of her *Miranda* rights. The court denied the motion.

Prior to trial, defendant filed a motion to suppress her statements to Officer Knowlton. The court held a hearing on the matter, and Knowlton testified regarding the circumstances of the interview. He again confirmed that he banged his hands on the table and that he called defendant a liar.

Afterwards, the court stated that it found that defendant came into the police station voluntarily and that Officer Knowlton had advised her that she was free to leave at any time. The court emphasized that at no point during the interview was defendant restrained or physically restricted in any way. The court further clarified that even if the interview was conducted at the police station, defendant's statements could still be

8

voluntary.  Thereafter, the court concluded that the statements were elicited voluntarily and defendant's *Miranda* rights were not violated.

b.  **Custodial Interrogation**

First, defendant renews her argument that her statements should have been suppressed, because her interview at the police station turned custodial when Officer Knowlton became aggressive, confrontational, and accusatory.

The Supreme Court in *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  (*Miranda*, *supra*, 384 U.S. at p. 444.)  " 'Thus two requirements must be met before *Miranda* is applicable; the suspect must be in "custody," and the questioning must meet the legal definition of "interrogation." ' "  (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 953.)

"Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1224.)  An individual is in custody for the purposes of *Miranda* if he or she is "deprived of his freedom in any significant way or is led to believe, as a reasonable person, that he is so deprived."  (*People v. Taylor* (1986) 178 Cal.App.3d 217, 225.)

Here, the parties dispute only whether defendant was in custody at the time she made the statements.  Determining whether a defendant is in custody is based on the "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  (*Stansbury v. California* (1994) 511 U.S. 318, 323.)  " '[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.' "  (*People v. Linton* (2013) 56 Cal.4th 1146, 1167.)  A person is in custody if he or she feels they cannot end

the interrogation and leave.  (*Howes v. Fields* (2012) __ U.S. __ , __ [2012 U.S. Lexis 1077] [132 S.Ct. 1181, 1189-1190].)

*People v. Aguilera* (1996) 51 Cal.App.4th 1151 set forth some of the circumstances relevant to determining whether a defendant was in custody for the purposes of *Miranda*.  "Among them are whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation."  (*Id*. at p. 1162.)  "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest."  (*Ibid*.)

" 'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact.  [Citation.]  When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently

10

decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave." ' " (*People v. Moore* (2011) 51 Cal.4th 386, 395.)

Here, there are some factors tending to show that defendant was <u>not</u> in custody. Defendant voluntarily came to the police station for the interview after Officer Knowlton visited her at the gas station. At the beginning of the interview, Knowlton told defendant that she was free to leave at any time and she was never told she was under arrest, until hours later when she tried to leave. Defendant's conduct in trying to end the interview indicated awareness that she was free to leave the interview at anytime.[5] She was not restrained or handcuffed in any way. Although the door was closed, it remained unlocked. Knowlton was the only officer present during the interview.

However, there were many more serious factors tending to show that defendant was subjected to a custodial interrogation. The interview was initiated by Officer Knowlton, who went to the gas station to speak to defendant as a witness or a suspect and arranged the interview. The interview took place at the police station, and the officer closed the door. The interview was rather lengthy, as it lasted approximately two to three hours. Knowlton insinuated to defendant that he believed she was guilty of

---

[5] Defendant claims that her subjective belief that she could leave at any time, demonstrated by her request to leave the interview room at the end of the interrogation, is not a factor that should be considered by this court.

We agree with defendant that the standard to determine whether *Miranda* applies is not whether the *defendant* believes he or she is free to leave. The standard is whether a " ' "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave." ' " (*People v. Moore*, *supra*, 51 Cal.4th at p. 395.) However, whether she was told she "was free to terminate the interview and leave at any time and/or whether [her] conduct indicated an awareness of such freedom" was a circumstance relevant to the trial court's determination of custody. (*People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) Although this one factor is not dispositive, it can be considered.

11

embezzlement when he called her a liar. He banged his hands on the table five to six times to emphasize the point. Defendant was arrested at the end of the interview.

Preliminarily, we reject defendant's claim that the existence of probable cause for an arrest is determinative of whether *Miranda* warnings are required. "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495 (*Mathiason*).)

Therefore, having a probable cause to arrest will not always elevate a situation to the level of restraint on an individual's freedom requiring *Miranda* warnings. Neither is the officer's *undisclosed* subjective belief that he or she has probable cause to arrest a defendant a decisive factor. (*Stansbury v. California* (1994) 511 U.S. 318, 324.) "[T]he uncommunicated subjective impressions of the police regarding defendant's custodial status" are "irrelevant." (*People v. Stansbury* (1995) 9 Cal.4th 824, 830.) "[E]vidence of the officer's subjective suspicions or beliefs is relevant only 'if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave' or if such evidence is 'relevant in testing the credibility of [the officer's] account of what happened during an interrogation . . . .' " (*Ibid.*)

Accordingly, if the officer makes it *known* to the defendant that he or she is a suspect, then this factor may weigh in favor of a finding that the defendant was in custody for the purposes of *Miranda*. In defendant's case, Officer Knowlton made it known to defendant that, despite her claims of innocence, he believed she was lying about her involvement with the theft. This weighs in favor of a finding of custody.

Officer Knowlton's conduct during the interview, including his banging his hands on the table five to six times and calling defendant a liar, was accusatory and aggressive.

12

An investigating officer's aggressive demeanor during an interview can transform an otherwise noncustodial interrogation into a custodial one. For example, in *U.S. v. Beraun-Panez* (9th Cir. 1987) 812 F.2d 578 (*Beraun-Panez*), the Ninth Circuit concluded, under the federal "clearly erroneous" standard, that the district court did not err in finding that Beraun-Panez was in custody for the purposes of *Miranda*. The Ninth Circuit noted that Beraun-Panez was "subjected to psychological restraints" just as binding as physical restraints by repeatedly accusing him of lying, confronting him with false and misleading witnesses statements, employing "good guy/bad guy tactics," taking advantage of Beraun-Panez's status as an alien, insisting that he tell officers the "truth," and separating him from other individuals. (*Id.* at p. 580.)

Another example of an officer's aggressive or accusatory tone contributing to a defendant's custodial status can be found in *Aguilera*, *supra*, 51 Cal.App.4th 1151. There, the court described the conduct of the investigating officers as neither "unusual or unreasonable" but associated with a "full-blown interrogation of an arrestee." (*Id.* at p. 1165.) In *Aguilera*, the officers told Aguilera that he was not in custody but then later explained to him that he would be brought home only *after* he told officers the truth. (*Id.* at p. 1163.) And, "[g]iven the officers' repeated rejection of [Aguilera's] story, a reasonable person . . . would have realized that telling the 'truth' meant admitting the officers' information was correct and explaining how and why one was involved and that until this 'truth' came out, he or she could not leave." (*Ibid.*) And, the officers reinforced this perception when they informed Aguilera he was unable to leave if the officers had to interview an alleged alibi witness. (*Ibid.*) The appellate court in *Aguilera* concluded that the officers' behavior contributed to its conclusion that Aguilera was subjected to a custodial interrogation.

Here, like the officers in *Beraun-Panez* and *Aguilera*, Officer Knowlton expressed disbelief in defendant's story. Although he did not tell her she could not leave until she

13

told the truth, the parties do not dispute that Knowlton banged his hands on the table and called defendant a liar multiple times. Defendant was in a closed interview room at the police station, being asked direct accusatory questions by an officer who said he did not believe her. A reasonable person would not have felt they could leave. Based on this pressure, defendant changed her story several times.

We acknowledge that not all interviews conducted at police stations are custodial. Nor do all interviews turn custodial when investigating officers directly accuse a defendant of committing a crime. For example, in *Mathiason*, *supra*, 429 U.S. 492, the defendant voluntarily went to the police station to be interviewed. (*Id.* at p. 493.) The defendant was told he was not under arrest, but the door to the interview room was closed. The officer told the defendant that he believed the defendant was involved in a recent burglary and falsely told the defendant that his fingerprints were found at the scene. (*Ibid.*) At the end of the half hour interview, the defendant was not arrested. (*Id.* at p. 495.) The Supreme Court concluded that the situation was not custodial, and *Miranda* did not apply. (*Ibid.*)

Similarly, in *California v. Beheler* (1983) 463 U.S. 1121 (*Beheler*), Beheler voluntarily agreed to talk to police and accompanied officers to the police station. He was told he was not under arrest. (*Id.* at p. 1122.) Beheler was not advised of his *Miranda* rights. After a 30 minute interview, Beheler was released. (*Ibid.*) The Supreme Court again found that *Miranda* warnings were not required, because Beheler was not in custody at the time of the interrogation. (*Id.* at p. 1125.)

Defendant argues that *Mathiason* and *Beheler* are distinguishable, because in those cases the defendants were free to go home and were not arrested after the interview. We agree. Contrary to the People's assertions, whether a defendant was arrested at the end of the interview is a factor to be considered, as acknowledged in *Aguilera*, *supra*, 51 Cal.App.4th at page 1162. Additionally, unlike *Mathiason* and *Beheler*, defendant's

14

interview with Officer Knowlton was lengthy, lasting two to three hours. The interviews at issue in *Mathiason* and *Beheler* were both short, lasting only 30 minutes.

Here, balancing all the applicable factors present, we conclude that defendant was subjected to a custodial interrogation.[6] Although the interview with Officer Knowlton did not start out custodial, it became custodial when Knowlton called defendant a liar and banged his hands on the table. Defendant was at the police station for several hours and was subjected to accusatory questions posed to her by a police officer who called her a liar in a closed interrogation room. Although Knowlton had initially told her she was free to leave at any time, we do not believe a reasonable person would have felt that he or she had the ability to simply terminate the interview based on these circumstances.

Officer Knowlton did not specifically testify regarding at what point in the interview he began questioning defendant more aggressively, nor did he clarify if it was before or after she made some of the more incriminating statements, such as when she admitted to changing the Blanco Shell records on occasion to make it look like she was doing a good job. During the preliminary hearing, when defendant made her first motion to suppress, Knowlton was asked if he banged his hands on the table and called defendant a liar before she admitted to changing the records at Blanco Shell. Knowlton simply answered that it was "possible" that was when this occurred. Although Knowlton attempted to record the interview, which would have clarified the timing of his actions, the recording failed to save. Further, the trial court did not make any express factual findings on the timing of Knowlton's actions.

Additionally, Officer Knowlton's testimony during the renewed motion to suppress sheds no light on when he banged his hands on the table and became aggressive

---

[6] The parties do not dispute that an interrogation took place.

toward defendant. He merely reiterated his prior statement from the preliminary hearing that he did this approximately five to six times during the course of the interview.

"The prosecution has the burden of proving that a custodial interrogation did not take place." (*People v. Whitfield*, *supra*, 46 Cal.App.4th at p. 953.) Based on the lack of information regarding the timing of Officer Knowlton's accusations, we do not believe the prosecution met its burden to show that any of defendant's statements during the interrogation were not the product of a custodial interrogation. Accordingly, we are compelled to infer that all of defendant's inconsistent statements were the product of a custodial interrogation, and *Miranda* warnings should have been given. Since they were not given, none of her incriminating statements should have been admitted.[7]

   c. **Prejudice**

Admission of statements obtained in violation of *Miranda* is subject to the harmless error standard of review set forth under *Chapman v. California* (1967) 386 U.S. 18. Under *Chapman*, the error must be harmless beyond a reasonable doubt. The *Chapman* standard " 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.) We conclude the People have not met this burden.

During closing argument, the prosecutor reiterated much of the evidence it had against defendant, recounting her statements to Anderson and reiterating the fact that defendant was in charge of maintaining the record books. The prosecutor nonetheless also relied on the inconsistent statements she made to Officer Knowlton, stating: "[Defendant's] efforts to cover her crime continued with the detective who—don't fault

---

[7] Since we conclude the statements made to Officer Knowlton were obtained in violation of *Miranda*, we need not address defendant's alternative argument that her statements should not have been admitted because they were made involuntarily.

16

him for being persistent and pounding on a table and confronting the defendant with her lies when they were, that's his job. [¶] I would ask you to put aside feelings of sympathy for someone and just look at the facts. Defendant's statements even to the officer were, well, 'I don't know anything about [the gas shortage].' And then changing her statements to 'There must have been errors in the Simplicity fuel monitoring system.' "

The prosecutor again referred to defendant's statements to Officer Knowlton during closing argument, asserting that defendant had minimized her actions and made multiple misrepresentations. Summarizing some of defendant's interactions with Knowlton, the prosecutor asserted: "When asked by the officer, well how do you account for this, you know, she minimizes it in her continued statements of misrepresentations. She minimizes it initially by saying, well, I may have inadvertently converted a few numbers, transposed them, I corrected them. But this was a systematic daily ongoing change of significant numbers in volumes of gas and money."

It is true that the prosecutor referred to other facts and evidence that pointed toward defendant's guilt, including, for example, her access and ability to change the logs in the daily books, the significant amount of profit loss, and her explanation to Anderson that a gas leak contributed to the shortage. However, we cannot find beyond a reasonable doubt that the jury would have convicted defendant had her statements to Officer Knowlton been suppressed and that the guilty verdict was "surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

Since we cannot say on this record that the inclusion of her statements to Officer Knowlton that were obtained in violation of *Miranda* was harmless, we must reverse the judgment.

17

2.  *The* Pitchess *Hearing*

a.  **Background**

On December 3, 3012, defendant filed a motion under *Pitchess*, *supra*, 11 Cal.3d 531 seeking discoverable material from Officer Knowlton's personnel records.  She sought documents containing evidence of citizen complaints against Knowlton reflecting acts of misconduct, including acts of force, violence, threats, intimidation, dishonesty, or the preparation of false or misleading police reports.  Later, she limited the scope of the *Pitchess* motion to focus on acts involving Knowlton's credibility and dishonesty.

The court conducted an in camera hearing with the custodian of records.  During the hearing, the court asked the custodian of records under oath if he had reviewed Officer Knowlton's personnel files, and if the custodian had identified or designated any documents that would pertain to either dishonesty, credibility, or moral turpitude.  The custodian answered that he had reviewed the files and had not found any relevant documents.  The city attorney, who was also present during the in camera hearing, attested that he had reviewed the custodian's summary of complaints against Knowlton and also believed there was nothing alleged pertaining to credibility, dishonesty, or moral turpitude.  Without reviewing any of these documents itself, the court denied the motion, relying on the custodian's determination that there were no discoverable records.

b.  **Statutory Framework**

The California Supreme Court has "recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1219 (*Mooc*).)  As described in *Mooc*, "[w]hen a defendant seeks discovery from a peace officer's personnel records, he or she must 'file a written motion with the appropriate court' (Evid. Code, § 1043, subd. (a)) and identify the proceeding, the party seeking disclosure, the peace officer, the

18

governmental agency having custody of the records, and the time and place where the motion for disclosure will be heard (*id*., subd. (b)(1)).” (*Id*. at p. 1226.)

“If the trial court concludes the defendant has fulfilled these prerequisites and made a showing of good cause, the custodian of records should bring to court all documents ‘potentially relevant’ to the defendant’s motion. [Citation.] The trial court ‘shall examine the information in chambers’ (Evid. Code, § 1045, subd. (b)), ‘out of the presence and hearing of all persons except the person authorized [to possess the records] and such other persons [the custodian of records] is willing to have present’ (*id*., § 915, subd. (b); see *id*., § 1045, subd. (b) [incorporating *id*., § 915]). Subject to statutory exceptions and limitations, discussed below, the trial court should then disclose to the defendant ‘such information [that] is relevant to the subject matter involved in the pending litigation.’ (*Id*., § 1045, subd. (a).)” (*Mooc*, *supra*, 26 Cal.4th at p. 1226.)

We review the trial court’s ruling on defendant’s *Pitchess* motion for abuse of discretion. (*Alford v*. *Superior Court* (2003) 29 Cal.4th 1033, 1039.)

### c. Analysis

After a review of the sealed transcript of the *Pitchess* hearing, we conclude the record is insufficient for us to determine whether the trial court abused its discretion in denying discovery.

The custodian of records is not required to submit an officer’s entire personnel record, only those that are “potentially responsive to the discovery request.” (*People v*. *Guevara* (2007) 148 Cal.App.4th 62, 68.) However, “our Supreme Court has directed that ‘[t]he custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant’s *Pitchess* motion.’ . . . . [¶] Accordingly, in cases such as this where the custodian of records does not produce the entire personnel file for the

19

court's review, he or she must establish on the record what documents or category of documents were included in the complete personnel file. In addition, if it is not readily apparent from the nature of the documents that they are nonresponsive or irrelevant to the discovery request, the custodian must explain his or her decision to withhold them. Absent this information, the court cannot adequately assess the completeness of the custodian's review of the personnel files, nor can it establish the legitimacy of the custodian's decision to withhold documents contained therein. Such a procedure is necessary to satisfy the Supreme Court's pronouncement that 'the locus of decisionmaking' at a *Pitchess* hearing 'is to be the trial court, not the prosecution or the custodian of records.' [Citation.] It is for the court to make not only the final evaluation but to make a record that can be reviewed on appeal." (*Id*. at pp. 68-69.)

Here, it is unclear whether the custodian of records brought the entire personnel record, or simply portions of it. The custodian of records merely stated that he had brought Officer Knowlton's "files." The custodian of records failed to describe what was in the files and did not provide a summary of what documents were in the files. The record also reflects that the court did not actually review any of the documents prepared or brought by the custodian of records. Nor did it question the custodian of records about what documents or categories of files the custodian of records had reviewed in order to reach the conclusion that there was no evidence pertaining to Knowlton's credibility or honesty. In this case, the court impermissibly deferred to the custodian of records' judgment that there was no discoverable evidence.

Therefore, we are unable to conduct a meaningful review on appeal, because the trial court failed to conduct a *Pitchess* hearing following the proper procedure.

3. *The Restitution Fine*

Since we conclude that defendant's case must be reversed, we need not address the propriety of the restitution fine imposed.

20

**DISPOSITION**

The judgment is reversed.

_____

Walsh, J.[*]

WE CONCUR:

_____

Rushing, P.J.

_____

Elia, J.

People v. Dilley
H040167

_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.