Filed 3/17/14  P. v. Mendoza CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072489 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F00251) |
| v. | |
| BERNARDO MENDOZA, | |
| Defendant and Appellant. | |

Defendant Bernardo Mendoza pleaded no contest to driving while his privilege was suspended or revoked for having driven under the influence.  (Veh. Code, § 14601.2, subd. (a); count three.)  A jury found him guilty of driving under the influence of an alcoholic beverage (Veh. Code, § 23152, subd. (a); count one) and driving while having 0.08 percent and more, by weight, of alcohol in his blood (Veh. Code, § 23152, subd. (b); count two).  The jury also found true an allegation that defendant drove with a blood-alcohol concentration of 0.15 percent or more.  (Veh. Code, § 23578.)  Defendant admitted that he had two prior convictions of violation of Vehicle Code section 23152,

1

subdivision (b), and that he had served a prison term for each of them.  (Pen. Code, § 667.5, subd. (b).)  He was sentenced to prison on count two for the upper term of three years plus two years for the prior convictions.  Sentence on count one was stayed pursuant to Penal Code section 654.  A concurrent jail term of six months was imposed on count three.

On appeal, defendant contends his count one conviction must be reversed because the trial court erroneously admitted, over his objection, his incriminating responses to custodial interrogation that had not been preceded by advisement of his constitutional rights.  We affirm.

FACTS

*Prosecution Case-in-Chief*

On January 2, 2012, about 12:58 a.m., Sacramento County Sheriff's Deputy Margaret Mickelson was driving a marked patrol car in the vicinity of Madison Avenue and Manzanita Avenue.  She saw a blue sport utility vehicle (SUV) traveling eastbound on Madison, and it "appeared to be going slower than the posted speed limit."  Vehicle traffic at the time was "light to none."  As Deputy Mickelson watched, the SUV "swerved across the solid white line on the far right lane into some gravel area, and it kicked up some rocks."  The SUV crossed the solid white line a second time.

Deputy Mickelson was in the far right lane going approximately 45 miles per hour, which is the posted speed limit; the SUV was in the same lane traveling approximately 38 or 39 miles per hour.  After about a quarter mile to half a mile, Deputy Mickelson activated the patrol car's sirens and overhead lights in order to initiate a stop of the SUV.  She suspected that its driver was under the influence.  Deputy Mickelson explained the reasons for her suspicion as follows:  "He was driving below the speed limit, which is an indicator that we were taught in the academy.  He swerved across the solid white line in the number three lane, kicking up dirt and rocks from the gravel area.  In fact, I think he

2

almost hit the oleanders, and he continued to -- to bounce kind of back and forth in the lane, all the way to Dewey."

Shortly after Deputy Mickelson activated her sirens and overhead lights, the SUV pulled into a gas station. The store at the gas station was not open, and Deputy Mickelson did not know whether customers arriving at the gas station could operate the gas pumps. She walked up to the SUV; defendant was the only occupant. As Deputy Mickelson spoke to defendant at the driver's side window, she could smell a "strong odor of alcohol coming from his breath, and his eyes were kind of red and glossy." She asked him to get out of the car. At the same time, her partner called the California Highway Patrol (CHP) and asked for assistance.

Holding defendant's arm, Deputy Mickelson escorted him to the patrol car. As she did so, she noticed that he was "unsteady on his feet." She put him on the patrol car's rear seat and closed the door, which could not be opened by anyone seated on the rear seat. Defendant was not handcuffed. Deputy Mickelson reentered the car. There is no indication that, in his state of intoxication, defendant perceived a lack of door handles or his inability to leave the car unassisted.

Deputy Mickelson's partner looked into the SUV and saw a "12- or 18-pack" of beer on the passenger floorboard, "a can of . . . beer in the center console, and . . . some empties, four to six empties on the floorboard around the pack that was on the floorboard." The can in the console was more than half full and was cold to the touch. Condensation was visible on the outside of the can.

There is no indication that defendant, in his state of intoxication, had witnessed the partner's examination of the SUV or had perceived that the partner had discovered open containers inside the car.

In the patrol car, defendant conversed with the deputies about how much alcohol he had consumed. Deputy Mickelson said it was a "[f]riendly" talk, although there was a

3

language barrier because defendant spoke little English. Defendant said that "he had ten beers."

On the night of the incident, CHP Officer Fernando Romero was working the graveyard shift with his partner, Officer Blankenship. Around 1:10 a.m., Officer Romero was dispatched to assist Deputy Mickelson with a possible incidence of driving under the influence (DUI) of alcohol. The CHP officers drove to the gas station where they met with Deputy Mickelson and her partner.

Officer Romero saw defendant sitting in the back of the deputies' patrol car. He was not in handcuffs. Officer Romero asked defendant to get out of the car, and he complied. Officer Romero noticed that defendant had "red and watery eyes." He had "slow, slurred speech, and [Officer Romero] smelled the odor of an alcoholic beverage coming from his breath." As defendant walked to the front of the CHP car, Officer Romero noticed that "he walked in a slow manner, unsteady on his feet."

Officer Romero talked to defendant in Spanish. Officer Blankenship was "in the general area," making sure no one walked toward, between or behind them; or approached them in any manner.

Defendant told Officer Romero his name and date of birth. Defendant said that he was "coming from a casino" on San Juan Avenue. Officer Romero asked defendant a series of questions to "determine where he was coming from, how his night was going, if he had consumed any alcoholic beverages during his night, [and] his overall physical wellness." The questions help the DUI investigation by providing a "back story to what he was doing throughout his evening, throughout his day. It . . . gives [the officer] any admissions that he has of drinking alcohol throughout the day, [and] whether he has any physical impairments that are going to affect his field sobriety tests later on."

Defendant told Officer Romero that the SUV had no mechanical defects and that he was neither sick nor injured. Defendant denied that he was diabetic or epileptic.

4

Defendant said that he had no physical impairments and that he had last slept the previous evening for about 12 hours.

Officer Romero asked defendant if he had been drinking; he said he "drank ten Corona and Modelo beers." Defendant said he stopped drinking when he was pulled over by the sheriff's deputies. When asked to describe how the alcohol was affecting him, with zero being no affect and 10 being "the most drunk he's ever been," defendant said he "was an eight."

Officer Romero asked defendant whether he would perform any field sobriety tests. Defendant "related he knew he was drunk and did not want to waste [the officer's] time." Officer Romero then asked defendant if he was willing to take a preliminary alcohol screening (PAS) test.

At 1:33 a.m., Officer Romero administered the first PAS test. The result was 0.244 percent blood-alcohol content. Two minutes later, the officer administered the second PAS test. The result was 0.236 percent blood-alcohol content. Defendant was placed under arrest.

In deciding to arrest defendant, Officer Romero considered the "symptoms of intoxication . . . , his admission, and the PAS device results." More particularly, the officer had observed the "odor of an alcoholic beverage emitting from [defendant's] breath, red and watery eyes, slow and slurred speech, and his unsteady gait."

Officer Romero took defendant to the CHP's North Sacramento office where he submitted to a blood test. The blood was drawn at 2:08 a.m. The alcohol content in the blood sample was 0.27 percent.

*Defense*

The defense rested without presenting evidence or testimony.

DISCUSSION

Defendant contends his count one conviction must be reversed because the trial court erroneously admitted, over his objection, his incriminating responses to custodial

5

interrogation that had not been preceded by advisement of his constitutional rights. He further claims the court's error was not harmless beyond a reasonable doubt. We find no prejudicial error.

1. *Background*

In a written motion in limine, defendant requested an Evidence Code section 402 hearing to determine the admissibility of any pretrial statements he had made. The motion argued that defendant was in custody and was being interrogated when he made certain incriminating statements to the sheriff's deputies and to Officer Romero. Because he had not been admonished of his constitutional rights, defendant contended the statements should be excluded from the trial.

Defendant's counsel orally argued that the statements should be excluded because, once defendant was put onto the backseat of the deputies' patrol car, he was in custody and subjected to interrogation. Thereafter, counsel asserted, when defendant was removed from the deputies' car and moved to the front of Officer Romero's car, "questions were asked of him that would appear likely to elicit incriminating statements."

The trial court denied defendant's motion to exclude his statements. Regarding the statements in the deputies' car, the court ruled: "I think the law suggests that before a person is arrested, it is lawful to ask questions in the course of a DUI investigation that occurs on the roadway, . . . in close proximity to when somebody was reasonably detained. . . . [T]his alleged statement was before the DUI investigation had really taken place. They were waiting for it. And my conclusion is, the fact that the defendant was detained is not a sufficient basis to turn what was really just a typical kind of conversation you have with somebody on the roadway into a custodial interrogation . . . ."

Regarding the statements to Officer Romero, the trial court ruled: "[T]his seems to be classic on-site investigation into DUI in connection with a field sobriety test. There is no probing. Apparently, [the officer] was just going down a list of questions."

6

2.  Miranda

In *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda),* the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  (*Miranda, supra,* 384 U.S. at p. 444, fn. omitted.)

No *Miranda* warnings need be given to an individual detained pursuant to a traffic stop, since the detainee is not "in custody."  (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440 [82 L.Ed.2d 317, 334-335] (*Berkemer*).)  "[D]etention of a motorist pursuant to a traffic stop is presumptively temporary and brief."  (*Id*. at p. 437.)

An "in custody" determination depends on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned.  (*Stansbury v. California* (1994) 511 U.S. 318, 323-324 [128 L.Ed.2d 293, 298-299] ["in custody" requirement is not satisfied merely because the police interviewed a person who was the focus of a criminal investigation].)  To ascertain whether the detainee is "in custody" for purposes of *Miranda*, all of the circumstances surrounding the interrogation should be considered, including the location of the interview; whether the suspect was informed that he or she was under arrest; the length of the interview; the number of officers participating; whether the officers were confrontational and/or accusatory; and whether the investigating officers used interrogation techniques to pressure the suspect. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*).)  The trial court must measure all of these circumstances against an objective, legal standard: "would a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of

movement to the degree normally associated with a formal arrest. [Citations.]" (*Id*. at p. 1161; *Thompson v. Keohane* (1995) 516 U.S. 99, 112 [133 L.Ed.2d 383, 394].)

### 3. *Deputy Mickelson*

Deputy Mickelson testified at the pretrial hearing that she stopped defendant for driving below the posted speed limit and swerving out of his land and crossing over the solid white line onto the shoulder of the road. Upon contacting defendant, who was the sole occupant of the car he was driving, Deputy Mickelson observed "a strong odor of alcohol that was coming from him. His eyes were bloodshot, and he was slow to respond to [her] questions." Deputy Mickelson said she was "fairly certain he was under the influence of alcohol, and [her] intention was to detain him for the highway patrol to come out and evaluate him."

Deputy Mickelson held defendant's arm as she led him to the backseat of the patrol car and closed the door, which he could not open. There is no indication that, in his state of intoxication, he perceived a lack of door handles or his inability to leave the car unassisted. Defendant was not placed in handcuffs. Deputy Mickelson said she "typically [does not] handcuff DUI suspects. They're . . . going to have to come back out of the car and perform field sobriety tests, so unless they are uncooperative, [she does not] generally handcuff them." Defendant sat in the patrol car for 20 to 25 minutes until Officer Romero arrived at the scene of the traffic stop.

There is no indication that defendant, in his state of intoxication, had witnessed the partner's examination of the SUV or had successfully perceived that the partner had discovered open containers inside the car.

While defendant sat in the back of the patrol car, Deputy Mickelson asked him if he had anything to drink. Defendant said he had "ten beers." Deputy Mickelson admitted that she had not admonished defendant of his rights before asking any questions. She described the tone of their conversation as "[a]micable."

8

4. *Officer Romero*

Officer Romero testified at the pretrial hearing that he was dispatched to the gas station about 1:10 a.m. He found defendant sitting in the back of the deputies' patrol car. Officer Romero brought defendant to the front of the CHP car.

Officer Romero testified that he typically asks DUI suspects questions to help him "determine if the subject had any alcoholic beverages prior to driving." The questions pertain to "where the subject is coming from, where . . . they are going, . . . what they [have] been doing throughout the night, whether they are driving or not, if they have consumed any alcoholic beverages or illegal drugs, last time they ate, last time they slept, [and] whether they have any physical impairments that will affect their field sobriety tests."

Officer Romero said he asked defendant the foregoing questions, but he had not admonished defendant of his rights before questioning him. Defendant told Officer Romero, among other things, that he had consumed "ten Modelo and Corona beers." Defendant said he had started drinking between 1:30 and 2:00 p.m. the previous afternoon and had stopped drinking "right before he was stopped by the deputies." Defendant admitted he had been feeling the effects of the alcohol; on "a scale of zero to ten" defendant said he was "an eight." As Officer Romero began to explain the field sobriety tests, defendant said he "knew he was drunk and did not want to waste [Officer Romero's] time."

Even if we were to assume that defendant's statements to the officers should have been excluded pursuant to *Miranda*, admission of defendant's statements does not require reversal of count one because the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) Defendant concedes that the jury properly found him guilty of count two, driving with 0.8 percent blood-alcohol; and properly found true the special allegation that his blood-alcohol concentration was 0.15 percent or higher. The element of count one that was missing

9

from count two was whether defendant *was under the influence* of that alcohol. While defendant's statements were relevant to this issue, the jury also received undisputed expert testimony that "all persons are impaired for the purposes of driving at blood alcohol concentrations of .08 percent and above, and that most people are impaired at levels below that as well." In light of this unchallenged evidence, a person with a blood-alcohol concentration of 0.15 percent or above would necessarily be impaired for the purpose of driving.

Deputy Mickelson's observations of defendant's driving further showed that he was under the influence. She noted that he "was driving below the speed limit, which is an indicator that we were taught in the academy. He swerved across the solid white line in the number three lane, kicking up dirt and rocks from the gravel area. In fact, I think he almost hit the oleanders, and he continued to -- to bounce kind of back and forth in the lane, all the way to Dewey."

There was no issue as to whether the alcohol got into defendant's bloodstream by some means other than his voluntary consumption of alcoholic beverages. Thus, whether defendant admitted consuming the alcohol, or denied it, or said nothing at all, could not have affected the outcome of his trial. Defendant's statements were not important "in relation to everything else," primarily the overwhelming and undisputed scientific and expert evidence, that the jury considered on the issue, as revealed in the record. (*Yates v. Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 449], overruled on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4 [116 L.Ed.2d 385, 399].) The count one verdict was "surely unattributable to" the fact the jury heard *not only* the scientific and expert evidence but *also* defendant's statements to law enforcement. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 189].) This is so regardless of the vigor with which the prosecutor sought to admit defendant's statements into evidence.

10

DISPOSITION

The judgment is affirmed.


     NICHOLSON     , Acting P. J.


We concur:


     HULL     , J.


     MURRAY     , J.