Filed 10/15/20  P. v. Masaoka CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARTHER KAZUO MASAOKA,<br><br>    Defendant and Appellant. | G057600<br><br>(Super. Ct. No. 16HF1134)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Maria D. Hernandez, Judge.  Affirmed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Arther Kazuo Masaoka appeals from a judgment after a jury convicted him of unlawful taking of a vehicle. Masaoka argues the trial court erred by failing to instruct the jury on the mistake of fact defense, admitting his custodial statements, and failing to conduct an ability to pay hearing before imposing fines and fees. None of his contentions have merit, and we affirm the judgment.

## FACTS

One evening around 11:00 p.m., a private security guard (Guard) at a condominium complex saw a truck parked in front of a garage in violation of the complex's rules. The Guard did not see anyone around to explain why the truck was parked there. He called his company, relayed the truck's information, and requested a tow truck.

About 30 minutes later, the Guard met the tow truck driver (Driver). The Driver backed his tow truck near the back of the truck. The Driver got out of the tow truck and left its engine running because it was necessary to operate the lift. The Driver hooked up the tow truck to the truck and lifted the truck.

About that time, Masaoka and a woman ran outside yelling profanities. The Guard tried to explain Masaoka could pay a drop fee to have the truck released, but he kept yelling profanities. The Driver also told Masaoka about the drop fee and asked for his driver's license and registration to confirm he owned the truck.

Masaoka got into his truck, started the engine, and tried to drive it off the lift but was unsuccessful. He got out of his truck and argued with the Driver. The Guard called his company and requested police assistance.

As the Driver walked to the front of the truck to record the license plate number, Masaoka got into the tow truck's driver's seat. The Driver ran to the driver's side door and told him to get out. As the Driver opened the door and partially entered the tow truck to gain control, Masaoka drove the tow truck forward. Awkwardly perched on the tow truck's driver's side, the Driver used his right foot to press the brake pedal.

2

Nevertheless, the tow truck traveled forward between 40 and 60 feet eventually colliding with a tree. The Driver fell to the ground and injured his ankle. The tow truck, which was worth more than $950, sustained front-end damage. Masaoka attempted to flee, but the Guard caught him.

Officer Mark Fasano arrived and interviewed the Guard, the Driver, and the woman. Masaoka complained he was injured and was taken to the hospital. Fasano went to the hospital to speak with Masaoka.[1] Masaoka told Fasano that he saw the Driver hook up his truck to the tow truck. When he was unable to release his truck, he got into the tow truck and tried to drive away. Masaoka got into the tow truck because he was afraid the Driver was going to take his truck. He admitted to driving the tow truck but said his memory went blank from there. Fasano arrested Masaoka.

An information charged Masaoka with unlawful taking of a vehicle (Veh. Code, § 10851, subd. (a)) (count 1), misdemeanor battery (Pen. Code, § 242, all further statutory references are to the Penal Code, unless otherwise indicated) (count 2), and misdemeanor hit and run with injury (Veh. Code, § 20001, subd. (a)) (count 3).

At trial, Masaoka testified he operated two auto repair facilities, was a certified motor vehicle expert witness, and "provide[d] complex legal research and legal writing for class action lawsuits for a couple of small law firms." He explained the Driver was illegally towing his truck because he was loading furniture. He asked the Driver why he was towing his truck, but he did not answer. He got into his truck because the Driver improperly hooked up his truck and to get his personal belongings. Based on the Driver's non-responsiveness and an altercation he had with the same Driver a month before, Masaoka felt the Driver made up his mind to tow the truck. When his attempt to drive his truck away failed, Masaoka left his truck and went to the tow truck. He

---

[1] After an Evidence Code section 402 hearing, the trial court denied Masaoka's motion to exclude his statements pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We will discuss it in further detail below.

partially entered the driver's side door and grabbed the tow truck's remote control to lower his truck. The Driver yanked him by the neck and arm causing them both to fall to the ground. The tow truck moved forward between 5 and 15 miles per hour with no one in it.

Masaoka testified the Driver did not have the right to tow his truck. Masaoka admitted he did not have permission to be inside the tow truck or to use its remote control. He used the least intrusive means possible to stop the Driver from towing his truck.

The trial court denied Masaoka's request to instruct the jury on mistake of fact (CALCRIM No. 3406). The jury convicted Masaoka of count 1 and found true the value of the vehicle was more than $950. The jury could not reach verdicts on counts 2 and 3, and on the prosecution's motion, the court dismissed those counts.

The probation report indicated Masaoka stated he suffered from mental illness for much of his life and his mental illness contributed to his financial difficulties. He reported he was self-employed, performing legal research and writing for $990 per month.

At the sentencing hearing on April 12, 2019, the trial court placed Masaoka on three years of formal probation and ordered him to serve 180 days in jail. The court ordered him to pay the following: $300 restitution fine (§ 1202.4, subd. (b)); $40 court operations assessment fee (§ 1465.8); $30 conviction assessment fee (Gov. Code, § 70373); and $300 probation revocation fine (stayed) (§ 1202.44).

DISCUSSION

I. Mistake of Fact

Masaoka argues the trial court erred by failing to instruct the jury sua sponte on the mistake of fact defense. We disagree.

"[O]n request, a criminal defendant is entitled to pinpoint instructions that relate particular facts to an element of the charged offense and highlight or explain a

4

theory of the defense if the instructions are supported by substantial evidence. [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 542.)  Substantial evidence means evidence of a defense, which, if believed, would be sufficient for the jury to find a reasonable doubt as to the defendant's guilt.  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

A person violates Vehicle Code section 10851, subdivision (a), when the person drives or takes a vehicle not his or her own, without the consent of the owner, and with the specific intent either to permanently or temporarily deprive the owner of his or her title or possession of the vehicle.  (*People v. Morales* (2019) 33 Cal.App.5th 800, 804.)

The mistake of fact defense[2] provides a person cannot be convicted of a crime if they acted "under an ignorance of mistake of fact, which disproves any criminal intent."  (§ 26, class Three.)  "A mistake of fact defense 'requires, at a minimum, an actual belief "in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act . . . .""  [Citations.]  Moreover, for 'general intent crimes' the mistaken belief must be 'both actual and reasonable,' while specific intent crimes or crimes involving knowledge require only an actual mistaken belief. [Citation.]" (*People v. Givan* (2015) 233 Cal.App.4th 335, 343.)  We review a claim of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

---

[2]     CALCRIM No. 3406 states as follows:  "The defendant is not guilty of [insert crime[s]] if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact.  [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit [insert crime[s]].  [¶] If you find that the defendant believed that [insert alleged mistaken facts] [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for [insert crime[s]].  [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for [insert crime[s]], you must find (him/her) not guilty of (that crime/those crimes)."

Here, the trial court properly refused to instruct the jury on mistake of fact because there was not substantial evidence to support giving the instruction. It is true Masaoka testified he did not believe the Driver had the right to tow his truck. But there was no evidence Masaoka believed he had the right to take the tow truck. Indeed, Masaoka admitted he did not have the right to be inside the tow truck or use the remote control.

Masaoka's reliance on *People v. Navarro* (1979) 99 Cal.App.3d Supp. 1, 10-11, for the proposition the instruction was proper even if his belief was unreasonable is meritless. Aside from the fact his belief could have been unreasonable, the instruction still had to be supported by substantial evidence, which here it was not. The trial court's refusal to instruct the jury on the mistake of fact defense did not deny Masaoka a fair trial or implicate his federal constitutional rights.

## II. Miranda

Masaoka contends the trial court erred by denying his motion to exclude his statements to Farano at the hospital. Not so.

### A. Background

At an Evidence Code section 402 hearing, Farano testified that when he went to the hospital he had not determined if he was going to arrest Masaoka, and interviewing him was part of the investigation. When Farano arrived at Masaoka's hospital room, another police officer who had followed the ambulance to the hospital was standing outside with the door closed.

Farano, who was in uniform, entered Masaoka's room alone and found him lying in bed. Masaoka was in a small emergency room that fit only one bed. Farano could not recall if the other officer joined him in the room. Farano did not advise Masaoka of his *Miranda* rights or inform him he was free to leave. Masaoka never told Farano to leave or that he did not want to speak with him. He never tried to walk away.

6

Farano did not place him in handcuffs or restrain him in any other way. Farano did not draw his weapon.

When Farano questioned him, Masaoka's answers were appropriate and mostly lucid. A couple times he said "'my chest'" or complained of pain before he answered the question. Farano did not recall if Masaoka was on medication. Based on all the circumstances, Farano believed Masaoka was speaking freely about the incident. After completing his investigation, Farano determined he was going to arrest Masaoka.

The trial court ruled Masaoka's statements were admissible. It opined Masaoka was not in custody because Farano did not use force or fear, and there was no evidence the other officer was in the room.

B. *Analysis*

"Under *Miranda*, custody is a term of art meant to designate circumstances 'that are thought generally to present a serious danger of coercion.' [Citation.] Because a *Miranda* warning is only required once custodial interrogation begins, the defendant must necessarily have been in custody in order to assert a *Miranda* violation. Whether a person is in custody 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' [Citation.] When there has been no formal arrest, the custody issue revolves on how a reasonable person in the suspect's position would have understood his or her situation. [Citation.]" (*People v. Torres* (2018) 25 Cal.App.5th 162, 172 (*Torres*).)

"To determine whether an interrogation is custodial we consider a number of circumstances, including: 'whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the

7

person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.' [Citation.]" (*Torres, supra,* 25 Cal.App.5th at pp. 172-173.)

"We independently evaluate whether the defendant was in custody by considering the totality of the circumstances surrounding the incident. [Citation.] No single factor is dispositive. [Citation.] 'Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest.' [Citation.]" (*Torres, supra,* 25 Cal.App.5th at p. 173.)

Here, based on a totality of the circumstances, we conclude Masaoka was not in custody. Although Farano initiated the questioning, he did not tell Masaoka he was free to leave, and ultimately arrested him, the other circumstances convince us he was not in custody. Farano questioned Masaoka at a hospital, and not at a police station. (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1090-1091 [defendant not in custody in ambulance on way to hospital].) At the outset, Farano questioned Masaoka as a witness and not as a suspect. Masaoka agreed to answer questions, answered them freely, and never indicated he wanted to end the interview. Although his movement was limited by the fact he was in a hospital bed, Farano did not place Masaoka in handcuffs or restrain him in any other way. Although not entirely clear, the evidence tends to establish only one officer questioned him and the questioning appeared to be relatively brief. Based on Masaoka's willingness to continue answering questions, we can reasonably infer Farano

8

was not accusatory, aggressive, or domineering, and did not use interrogation techniques to pressure him. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1164 [highly significant whether questioning lengthy, aggressive, confrontational, threating, intimidating, and accusatory or brief, polite, and courteous].)

Masaoka relies on *People v. Layton* (1972) 29 Cal.App.3d 349 (*Layton*), to argue he was in custody. In that case, a police officer, who was in uniform, went to a hospital because defendant had been admitted for a drug overdose. (*Id*. at p. 351.) The officer spoke to defendant, who appeared under the influence, and learned he had taken LSD. (*Ibid*.) The officer and a nurse discussed that defendant had no funds or insurance and they decided he would be transferred to the county hospital for treatment. (*Ibid*.) The officer gave defendant a pat-down search, placed him in the locked portion of his patrol car, and transported him to the county hospital. (*Id*. at pp. 351-352.) At the county hospital, after the officer asked defendant if he was holding anything and he said he was not, defendant handed the officer a packet that contained an LSD tablet. (*Id*. at p. 352.) The officer advised defendant of his *Miranda* rights. (*Ibid*.) The *Layton* court held defendant was in custody after the officer arrived because he had reasonable cause to believe defendant committed a crime and had probable cause to make a formal arrest had he chosen to do so. (*Id*. at p. 352.) *Layton* is inapposite.

Farano testified that when he went to the hospital he was still investigating the incident. Additionally, Farano did not make arrangements with hospital staff to move Masaoka thereby controlling his freedom of movement. Masaoka arrived at the hospital in an ambulance, and officers did not control his freedom of movement. Finally, Farano did not search Masaoka. Masaoka's reliance on *Layton* is unpersuasive. Therefore, on balance, we conclude the circumstances demonstrate Masaoka was not in custody when Farano questioned him at the hospital.

9

*III. People v. Dueñas*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Masaoka asserts the trial court erred by failing to conduct an ability to pay hearing before imposing fines and fees. Assuming there was error, Masaoka was not prejudiced.

In *Dueñas*, an indigent mother of two who subsisted on public aid because she was unable to work due to cerebral palsy challenged the constitutionality of imposing mandatory court facilities and operations assessment fees and restitution fines without first determining the defendant's ability to pay them. (*Dueñas, supra,* 30 Cal.App.5th at pp. 1168, 1171.) The court held that imposing the fees and fine on an indigent defendant violated due process. (*Id.* at pp. 1160-1161.) As to the court facilities and operations fees, which the Legislature intended to be revenue raisers and not punishment, the court reasoned imposing these fees on indigent defendants was tantamount to "inflict[ing] additional punishment." (*Id.* at p. 1166, capitalization omitted.) As to the restitution fine, which the Legislature intended to be additional punishment, the court explained imposing a restitution fine on indigent defendants punished them differently than wealthy defendants because it deprived them of the opportunity to obtain mandatory expungement of the conviction as a matter of right. (*Id.* at pp. 1170-1172.)

We need not address the Attorney General's claim Masaoka forfeited appellate review of this claim, or whether *Dueñas* was correctly decided. Assuming the issue is preserved for review and there was error, the record before us demonstrates it was harmless beyond a reasonable doubt. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140, citing *Chapman v. California* (1967) 386 U.S. 18, 24.) "'Ability to pay does not necessarily require existing employment or cash on hand.' [Citation.] '[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future.' [Citation.] This include[s] the defendant's ability to . . . earn money after his release from custody. [Citation.]" (*People v. Hennessey* (1995)

37 Cal.App.4th 1830, 1837; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.)

We can infer Masaoka has the ability to pay the fees and fine from probable future wages. (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397; see § 1202.4, subd. (d) [ability to pay restitution fine includes future earning capacity].) Although the record suggests Masaoka may suffer from some mental illness, and that illness may contribute to his financial difficulties, at trial Masaoka testified he performed complex legal research and writing. In the probation report, he reported a monthly salary of $990. Based on this record, we conclude Masaoka has the ability to pay $370 in fines and fees.

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.

11