Filed 5/25/22  P. v. Ramos-Munoz CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MANUEL OVIDIO RAMOS-MUNOZ,<br><br>    Defendant and Appellant. | C086508<br><br>(Super. Ct. No. S15CRF0093) |

Defendant, Manuel Ovidio Ramos-Munoz was employed at a hotel that was the site of an early morning kidnapping and sexual assault.  The victim was a 22-year-old participant in a student work and travel program from Skopje, Macedonia who shared a room at the hotel with other students from Macedonia.  She was sitting alone outside the hotel talking on the phone at about midnight when attacked at knifepoint by a man who forced her to accompany him downstairs and across the street, all the while kissing her, demanding that she commit sexual acts, hitting her, cutting her clothes off, attempting

sexual intercourse and walking her back toward her hotel room, before she escaped, totally naked, to her hotel room. She suffered cuts, scratches and bruises.

Defendant along with three other male hotel employees were asked to provide saliva samples. Defendant did so. Thereafter, defendant contacted the hotel manager and informed the manager that he had done something wrong in reference to the event. The manager suggested that he speak with law enforcement authorities. He did so, and his statements to investigators became the basis for the charges against him.

He appeals a judgment entered after a jury determined that he had committed all but one of the charged sex offenses and associated enhancements, resulting in a sentence of an indeterminate term of 167 years to life, plus a determinate term of 16 years. He contends the trial court prejudicially erred in allowing the introduction of his partial confession obtained by investigating officers in violation of his privilege against self-incrimination under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Specifically, he complains investigators should have provided him *Miranda* warnings because his interrogation was custodial. We disagree and affirm his conviction.

FACTUAL AND PROCEDURAL BACKGROUND

A.    The Trial Testimony

*The Victim's Testimony*

The People presented the testimony of the victim that she had been outside her hotel room about midnight talking on a cell phone, with her roommates in the room, when a man took her unawares, held a knife to her neck and told her to "be quiet or else he would kill" her. He forced her down the stairs and threatened to kill her if she was not quiet. She dropped her phone and was taken across the street to an area where there were three large containers. It was very dark, but the victim described her attacker as a "little bit taller" than her (approximately five feet eight inches tall), with an accent that was not American, appearing to be between the ages of 20 and 30 years old, and with "a little bit

2

of stomach." He forcibly kissed her mouth, and then shoved her to her knees and demanded that she orally copulate him. She did not smell alcohol on her attacker.

The victim resisted, telling her attacker that she did not want to and trying, unsuccessfully, to avoid putting his penis in her mouth. He hit her head, causing her to bleed and told her that he did not care. She complained of not feeling well and asked to go to the hospital. He told her to undress, and when she refused, he cut off all of her clothing with a knife. He repeatedly hit her and continually threatened to kill her if she was not quiet. The man pushed her to the ground and attempted intercourse with her, but he was unsuccessful because of her attempts to resist him. She said she "was trying to close [her] legs, and he was opening them again, and it kept going on." He tried to guide his penis into her, but he was unable "to go inside." The man moved her to another area behind the containers where he aggressively and repeatedly penetrated her vagina and anus with his fingers causing lots of pain. He handled her breasts and licked her vagina. At some point, he held her neck, making it difficult to breath.

The man started to take her back towards the hotel. He asked for her room key and if anyone else would be inside the room. Halfway to the hotel, the man forced her back to the area with the large containers. He again forced her to her knees and made her orally copulate him, but he never ejaculated. The man forced her around and attempted anal sex. The victim got away and fled naked, running to her hotel room where she entered the bathroom. She heard someone trying to enter her room behind her and her roommates screaming. The entire attack may have taken 15 to 20 minutes or longer. Someone called 911.

*Testimony of Investigating Officers*

South Lake Tahoe Police Officer Octavio Nava was dispatched to the hotel at about 2:00 a.m. where he met the victim holding a white towel to her face covering a cut above her right eye with blood still coming out of the cut. She also had minor cuts on her fingers. She was taken to the hospital by ambulance.

3

Detective Nick Carlquist responded to the hotel at approximately 3:00 a.m. and interviewed M.K., one of the victim's roommates, who said a Hispanic man with a "pot belly" had burst into their room. She did not see his face because the room was dark, and light outside caused the person to be "backlit." Carlquist's report indicated the man was "heavyset" and "much taller" than the victim.

Detective Carlquist reported he was contacted by M.K. again later and he went back to the hotel to meet with her. She was crying, nervous and anxious because she recognized a hotel employee as possibly the man who entered the room the night before, "which made her very emotional." The man had "the same movements or same gait" as the man who had come into the room. She reported he had come to their room the day before the attack and had acted inappropriately flirtatious. He was wearing blue jeans, a tan logoed shirt, and had a nose ring. Carlquist was unable to locate anyone matching this description on his own. M.K. never identified defendant as the person she suspected.

Detective Carlquist spoke with Ruben Zepeda Raya, the general manager of the hotel, told him there was an incident at the hotel the night before, and asked to speak with any males who worked for the hotel. Defendant was among four men gathered at the hotel office who agreed to give a sample of saliva. Carlquist testified that defendant had been wearing jeans, a tan shirt, and had a nose ring. He was the only employee with a nose ring.

Later in the afternoon, defendant came into Raya's office; Raya said defendant "was sad." Defendant said he wanted to talk to Raya. Defendant told Raya he had done "something wrong" and "was worried." Defendant, according to Raya, said that "it was in reference to the event -- you know, to the investigation." Raya suggested defendant talk to the police. Raya then called the police. Raya told Carlquist that after the men had been dismissed to return to work, defendant, "had come back to him and appeared emotional and had said that he had done something bad [the night before]."

4

Detective Carlquist and Detective Doug Sentell, who returned to the hotel after interviewing the victim at the hospital, met with defendant and his wife. Defendant looked nervous, shy, anxious, and was avoiding eye contact. Raya translated for the officers, telling defendant that he was free to leave, but asking if he would voluntarily come with them to the station for a recorded interview. Defendant agreed, and was transported without restraints in the front passenger seat of Sentell's car to the police station. Once at the station, defendant was placed in an interview room and interviewed by Sentell with Officer Nava assisting with translation from English to Spanish and vice versa. A video recording of defendant's interview was admitted into evidence and played for the jury.

B.      Defendant's Interview

At the outset of his interview with defendant, Sentell told him that he was not under arrest "and he could not speak to [Sentell] if he didn't want to, and that if he wished to leave, he could leave at any time. And once he told [Sentell] that, we'd be done." Sentell also told him the door to the interview room was unlocked. In the interview room, defendant sat at a small desk across from the detective. Officer Nava sat behind Sentell in another chair. Defendant was not handcuffed.

Defendant explained that he needed to speak with the authorities because he drank heavily the night before and did not remember what he had done, but nonetheless did not think he was involved.

For the first hour or so of his interview, defendant recounted his attendance at a work party at the hotel, that he had been drinking heavily, had gone for more drinks with Pedro Rodriguez Pineda, and then had walked back to the hotel where he lived later that night. When he arrived home he felt like he wanted to vomit. He took a shower and noted mud on his knees and shorts. Defendant was unsure how the mud got there but believed that he may have fallen down. When he finished showering, he saw flashing lights and learned of the rape of a woman at the hotel and that her face was bleeding.

5

Sentell was cordial and built a rapport with defendant by telling him it was okay when he could not remember details and asking about defendant's family. After nearly an hour of questioning, there was a break of approximately nine minutes. When the officers returned, Sentell asked defendant to show them his room on the map of the hotel. Sentell asked defendant to tell him what he remembered now that he had time to think, and defendant told them more about the mud he had on his shorts, about discussions he and his wife had with various people at the scene, and that he moved the individuals staying with the victim into four new rooms. They discussed defendant's wife's religion, that defendant converted when he married her, and that his wife did not like his drinking. Sentell continued building a rapport with defendant, stating that everyone, including himself, sins.

At this point Sentell's demeanor then changed somewhat. He continued to speak calmly and remained seated, but he came closer to defendant. He placed his hands on defendant's shoulder and leg, as well as putting a hand in front of defendant and interrupting when defendant professed amnesia. Sentell indicated he thought defendant knew more than he was saying; that defendant came to see them in order to do what is right. Defendant started to say that he felt in his heart that he did not do it even though he did not recall. Sentell interrupted; he invoked defendant's good intentions, explaining that everyone makes mistakes and that defendant must tell the truth so that everyone can heal. He held defendant's hand while questioning him concerning injuries to that hand, but defendant denied knowing how his hand was injured. He implored defendant not to make him tell defendant's wife that defendant would not admit his mistakes.

Sentell falsely represented that there was a witness who saw defendant with the girl that was hurt, that they were going to take a break, and that after that "it will probably be your last opportunity" "to come back to the truth."

After a 22-minute break following nearly two hours of questioning, Sentell returned and told defendant that it was time to talk and explain what he was doing with

6

the victim because the people saw them together the night before. Defendant shook his head, but Sentell insisted that he tell him what they were doing together. Defendant repeatedly denied being with her. Defendant went on to explain that there was a period that he did not recall, and years ago when he drank he would black out. If he had done something drunk that he did not recall, he wanted to pay for that, but defendant maintained that he did not remember. Sentell opined that defendant did indeed recall what happened the night before and that defendant was just attempting to block out what happened with the victim.

Defendant was shown pictures of the victim and exclaimed, "Oh my God." He was shown pictures of containers near the hotel and told that some of the blood found there was from a male, and that they had a machine comparing his DNA sample he had given with that blood. Sentell expressed fear that the machine would tell them what he already knew, that defendant and the victim were there, and this reveal would occur before defendant admitted his mistakes. And that if the machine did that, it would only say that defendant committed the act, but not why.

Sentell's questioning seemed calculated to suggest that defendant was a good person but was not telling what he knew and Sentell wanted to provide him with an opportunity to set things right.

As Sentell was leaving the room, defendant asked the translating officer in Spanish to tell him not to leave because defendant wanted to speak with him. Sentell came back, and defendant said that he remembered that the woman was on the stairs, he was drunk, and he grabbed her, but he did not recall why. He did not recall anything else.

Sentell insisted defendant knew more.

Defendant said what happened hurt him in his heart, he did not feel right and wanted to be right with God, his wife, and with everyone, but all that he remembered was grabbing her from behind. Defendant then added that he remembered going across the

7

street to a place where cars were not supposed to be, with the victim, by the apartments downstairs.

Sentell had defendant close his eyes to picture what happened. Defendant then relayed that when he grabbed the victim, she was in front of room 309, which is downstairs. The victim did not do anything when he grabbed her, and she went with him. He told her "Let's go." They went to the place in the photos.

Defendant continued on with much encouragement and cajoling to describe how he grabbed her hair and how she left running, but denied knowing how many times he hit the victim. He admitted cutting and ripping the victim's upper clothes, cutting himself, touching her on the breasts and vagina with his hands, and putting a finger inside her vagina, but denied any memory of entering the victim's room. He sat outside his room, feeling like he needed to throw up and then showered. He denied showering to destroy any evidence he might have had on him.

The interview went on a while longer, but without any additional factual admissions.

C.    Sexual Assault Suspect Exam of Defendant

Following his interrogation, defendant was subjected to a sexual assault suspect exam. Detective Jake Herminghaus took defendant from South Lake Tahoe to the clinic on Stockton Boulevard in Sacramento to be examined. After the examination was completed, Herminghaus took defendant to the El Dorado County jail to be booked.

The exam was conducted by Dr. Angela Vickers, a pediatrician specializing in child abuse and neglect, but cross-trained to do adult sexual assault exams.

Dr. Vickers noted that defendant had a cut on one of his fingers and "had multiple little nicks on his forearms." When asked to explain how his finger had come to be cut, defendant said it had happened sometime before the alleged assault.

8

Dr. Vickers collected swabs from defendant's mouth, penis and scrotum. It appeared his entire body was shaved except for his head. The swabs were sealed in a "crime kit" and subsequently turned over to law enforcement for further forensic testing.

D.      Search of Defendant's Hotel Residence

South Lake Tahoe Police Officer Matthew Morrison served a search warrant at the hotel, room 129, on June 12, 2015. This room was defendant's residence. Officer Morrison "collected several knives and articles of clothing and indicia in the name of [defendant]." Among other things, the officer seized "a blue polo shirt that was wet, and it appeared it had been like freshly rinsed out." This shirt was in a "laundry basket within the motel room in the bathroom."

Officer Morrison found a "Leatherman multi-tool" on top of one of the nightstands. In addition, he found an "SOG brand multi-tool in the third drawer of the dresser within the room." According to Officer Morrison, the multi-tool had a "straight knife blade" that can be locked in place along with "a serrated blade," a "pair of needle nose pliers with cutters," a Phillips head screwdriver, a pair of scissors, and a flat head screwdriver. Neither the knives nor the clothing appeared to have blood on them.

E.      DNA Analysis

Department of Justice criminalist Heather Tomchick testified as an expert in forensic serology and DNA analysis. Tomchick first analyzed the victim's sexual assault kit materials and later analyzed defendant's sexual assault suspect kit. No foreign DNA was detected in Tomchick's analysis of defendant's kit. For the victim's sexual assault kit, Tomchick first separated the sperm and nonsperm fractions for the vaginal and genital swabs. Because no p30 proteins consistent with male seminal fluid were detected, this process was not completed for the oral and anal swabs. Tomchick then performed Y-STR testing on the nonsperm fractions from both the vaginal and genital swabs.

Tomchick generated DNA profiles for the victim and defendant and then utilized these profiles to compare the DNA found in the victim's sexual assault kit. Defendant's

9

Y-STR profile matched the 17-locus DNA Y-STR full haplotype for both the vaginal and genital nonsperm fractions. This meant defendant's profile matched these results and would be expected to also match his male relatives, barring mutations. This profile would occur more generally in "no more than 1 in 2,070 African Americans, 1 in 2,457 Caucasians, and 1 in 1,580 Hispanics." Tomchick also found a 14-locus Y-STR partial haplotype in the sperm fraction from the genital swab, which she determined was consistent with defendant's DNA profile, but given that it had fewer points matching, it "would give us a statistic that is more common, so not as much weight to the specific." Tomchick also located very low-level amounts of male DNA in the victim's anal, buccal, and oral swabs, which were too small to make a meaningful comparison.

Further, Tomchick performed both traditional STR and Y-STR testing on the victim's facial swab. Tomchick testified her results from the STR testing found a mixture of a major female DNA profile and minor types from at least one contributor. Assuming only one foreign minor contributor, defendant could not be excluded. She estimated the statistical likelihood of a random match to defendant was "1 in 200 billion African Americans, 1 in 2.5 billion Caucasians, and 1 in 5.7 billion Hispanics." Tomchick's Y-STR analysis of the facial swab revealed a mixture of haplotypes and that defendant matched the major haplotype detected. Testing excluded defendant's brother as a match for the nonsperm vaginal and genital haplotypes, as well as the DNA recovered from the victim's facial swab, but not the partial haplotype from the sperm fraction. No DNA testing was performed on defendant's clothes, nor did Tomchick test any weapons.

F.      Interview of Pedro Pineda

Pedro Rodriguez Pineda is familiar with defendant "[t]hrough work." Pineda said he was not a friend of defendant's, nor did they socialize with one another.

One evening in June 2015, Pineda attended a party at the hotel. When the party ended at about 11:30 p.m., Pineda left with defendant; they went "[t]o the casinos." They

stayed at the casino until about 12:30 or 1:00 a.m. Pineda and defendant left together. Pineda said he "was going to [his] house, and [defendant] was going to his." Defendant then lived "at the hotel."

All the time they were together defendant was calm. Neither he nor defendant were stumbling or falling down. He and defendant "were not awfully drunk."

G.  Defense Evidence

The defense presented evidence from defendant's wife, N.M., who met him in 2007 and married him in 2010. Defendant had never been sexually aggressive with her. On or around June 10, defendant was working as a maintenance man at the hotel where they lived and hurt his right pinky, requiring ointment and a bandage. She described the wound as both a burn and a cut. The next day, there was a work party, which she attended with defendant who was drinking beer and tequila. She left the party at 9:30 p.m. and was still awake when defendant came home around 1:40 a.m. Defendant went into their bathroom to shower, and N.M. also went to the bathroom to relieve herself. N.M was upset that defendant had been drinking and returned home very late. Defendant apologized, and as they were getting ready for bed, defendant peaked through the blinds and noticed the flashing lights of a police car.

The two of them dressed and left their room to investigate. While outside, they encountered a young man and a young woman. The young woman told N.M. "that her friend was taken down the stairs by her hair, across the street, and that she was attacked and raped, and the girl came back to the room, and she was scared and crying." When N.M. spoke with her a second time, the girl added "that her friend was hit on the head, and that it was hit on her face, and that her clothes were cut off with scissors or a knife, and that there was lots of blood." In the interim, defendant provided the young man a new hotel room. When defendant returned to the front office, they locked up, and N.M. told him all of the information she had learned from the young woman.

11

Defendant and N.M. returned to their room and went to sleep. Defendant made her lunch the next morning and walked her to work as he always did. Later, after she returned from work, she ran into defendant and the young man from the night before. The man said, "that the friend -- the girl was taken down -- down the stairs by her hair and that -- taken across the street, and she was attacked, and she was raped and come [*sic*] back to the room and scared and crying, that she was hit on the head and on the face.· There was a lot of blood, and her clothes were cut up with scissors or knife." Defendant's wife denied that defendant ever told her he had done anything wrong or wanted to talk to "somebody." She was with him when he spoke with Raya. On cross-examination, N.M. denied that she had only informed defendant's counsel that she spoke with the young individuals mere days before. On redirect examination, counsel brought out that no member of law enforcement had ever interviewed her and no one had ever asked her about conversations with people in the parking lot on the night in question.

The defense also presented expert testimony from Dr. Richard Leo, a professor of law and psychology at the University of San Francisco, who was certified as an expert in "police interrogation, psychological coercion, and the making of false statements, admissions, and confessions." He opined defendant was subjected to a guilt-presumptive interrogation, which has dual goals of convincing the suspect authorities have conclusively established guilt and that it would be in his or her best interests to confess. On the interrogation video, Dr. Leo saw numerous interrogation techniques designed to induce a confession, including the use of false evidence, inducements, and time pressure techniques. He could not say how often false confessions happened but stated, "that it happens often enough to trouble us." He also discussed the myth that an individual would not confess unless subjected to physical coercion or mental illness. Dr. Leo explained the three causes of false confession are misclassification, coercion, and contamination error and discussed their application to the case, including the "guided visualization" used by Sentell. On cross-examination, the People brought out that Dr.

12

Leo had not considered any DNA testing done in the case, which could be important when judging the validity of a confession and could be independent evidence supporting the veracity of the confession.

The court then instructed the jury, and closing arguments occurred Thursday, November 2, 2017. The People argued in pertinent part that defendant's confession was direct evidence that he was guilty of the crimes, including his admission that he placed a finger in the victim's vagina. The prosecutor argued that defendant came forward after the collection of his DNA to minimize his behavior and that the evidence supported that it was a truthful confession because he knew details only the true attacker would know.

In response, the defense argued the investigation was incomplete, and the evidence was inconsistent with defendant's guilt. The victim did not smell any alcohol on her attacker's breath, despite defendant's drinking since 4:30 in the afternoon. Further, the victim said the knife was held to her throat from the inception of the attack, thus defendant's statement during the guided visualization that he cut his hand while opening the knife was inconsistent with the attack. Moreover, given the victim's testimony, there should have been blood on defendant's clothing and the knife recovered by authorities, but no such evidence was presented. Her description of her attacker's physical appearance and voice were also inconsistent with defendant. The DNA evidence was more consistent with an earlier consensual encounter. Finally, defendant had an alibi for the time of the attack, which started between midnight and 12:30 a.m. and lasted until 1:30 a.m. Defendant's partial confession was false and induced by authorities. Therefore, there was reasonable doubt that defendant assaulted the victim.

In reply, the People argued there was no evidence of any consensual sex between defendant and the victim, and that defendant had been identified by his DNA, which evidence was consistent with defendant's sexual excitement and insertion of his fingers. The victim's description was also consistent with defendant, and his alibi did not really alibi him. Defendant's confession minimized his involvement, but was not inconsistent

13

with the crime, nor was there anything wrong with the detective's interrogation technique that asked defendant to close his eyes. Defendant's expert had conceded that if defendant was guilty, the techniques utilized would have resulted in a true confession and that defendant's confession in the case was indeed a valid one.

Following closing arguments, the jury elected to return Tuesday, November 7, to continue their deliberations. That same day, the jury asked for a readback of the victim's testimony and to watch the video of defendant's confession. They then completed all verdict forms except one. The following day, the jury found defendant not guilty of one count of attempted forcible rape (Pen. Code, §§ 664/261, subd. (a)(2); count 7), but guilty as charged on all remaining counts and enhancement allegations. He was sentenced on January 26, 2018, to an aggregate indeterminate term of 167 years to life, plus a determinate term of 16 years. He was also ordered to pay various fines, fees, assessments, and restitution, none of which are challenged on appeal. Defendant timely appealed.

DISCUSSION

I

*Denial of Motion to Suppress*

A.     Proceedings in the Trial Court

Defendant's trial counsel filed a written motion to exclude his statement to the police investigators. Counsel asserted defendant agreed to accompany the officers to the police station to talk, but once there "the interview ripened into a custodial interrogation." Counsel argued that defendant should have been admonished of his *Miranda* rights before being interrogated further and the failure of the officers to advise him of his rights warranted exclusion of his statement at trial.

The trial court denied defendant's motion, writing in pertinent part:

"Here, the defense does not dispute that defendant voluntarily agreed to be interviewed by the South Lake Tahoe Police Department. But, the defense argues the

14

interview ripened into a custodial interrogation given the positioning of the officers, the touching of defendant, and religious references made during the interview.

"The defense's arguments are not persuasive. The interview occurred at the police station. Defendant was transported to the police department in an unmarked detective car. There are no bars or cages in the car, and defendant was seated in the front passenger seat and was not handcuffed.

"There were two officers present during the interview; one doing the questioning (Detective Doug Sentell) and the other officer (Officer Octavio Nava) acting as an interpreter. Detective Sentell confirmed with the defendant that he had voluntarily agreed to an interview and told him that he was free to leave. When the interview began, defendant was not formally arrested or frisked. The door to the interview room was not locked and defendant was not led to believe he was being restrained in a locked room. Detective Sentell was wearing a polo shirt, cargo pants, and a baseball cap. He did not display any weapons.

"While defendant was interviewed for approximately 3.5 hours, the interview was not continuous and was interrupted by several breaks, some lasting 20 minutes or more. Defendant was offered food, water, and bathroom breaks. He left the room for several minutes to use the bathroom.

"It is true Detective Sentell is seated close to defendant, but the interview room appears small. Indeed, Detective Sentell is outside the camera's field of view during a good portion of the interview. While Detective Sentell's manner and tone becomes more assertive later in the interview, his tone was even and was not threatening or intimidating. Detective Sentell touches defendant multiple times, but the touching appears to be an attempt to build rapport with defendant and is not aggressive or physically intimidating.

"During a portion of the interview Detective Sentell makes several religious references, but it was the defendant who initially raised the matter of religion. There is no indication defendant held strong religious beliefs or was particularly vulnerable to

15

religious anxieties or a sense of guilt. (See *People v. Carrington* (2009) 47 Cal.4th 145, 176 [97 Cal.Rptr.3d 117].) In fact, he references that his wife was troubled by his consumption of alcohol the evening of the events in question, because such conduct is contrary to the tenets of their faith. The substance of Detective Sentell's comments 'sought to evoke defendant's better nature' by asserting defendant would feel relief by telling the truth. (See *ibid.*) Moreover, the religious references are few and do not dominate the interview.

"Under the totality of the circumstances, the Court finds that the defendant was not in custody when he made the inculpatory statements during the interview in question. The Court finds that in viewing the totality of the interview, a reasonable person in defendant's position would not have felt he was in custody at the times pertinent. For the foregoing reasons, the defendant's motion to exclude his statement to Detective Sentell is denied."

B.      Controlling Principles

*Miranda* warnings are required when a suspect is subjected to custodial interrogation. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301.)

Prior to *Miranda*, the Supreme Court addressed the propriety of confessions as issues of due process through the due process clause of the Fourteenth Amendment. The voluntariness of a confession was the key issues. In a paradigm shift, the Supreme Court in *Miranda* analyzed the issue through the Fifth Amendment's self incrimination clause. Defendants could challenge incriminatory statements as involuntary within the meaning of the due process clause. But the court concluded the process of custodial interrogation endangers a suspect's Fifth Amendment privilege because it exerts inherent pressures that

16

undermine a suspect's ability to exercise the right to remain silent.  The antidote to such pressures was a system of warnings and waivers devised by the court to counteract the pressures inherent in a custodial interrogation.  However, the warnings and waivers are only required when a suspect has been "taken into custody."  (See Weisselberg, *Mourning Miranda* (2008) 96 Cal. L.Rev. 1519.)

An interrogation is custodial for *Miranda* purposes "when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.'  [Citation.]  Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.  [Citations.]  When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation."  (*People v. Moore* (2011) 51 Cal.4th 386, 394-395.)  The question to be resolved is " 'would a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest[?]' "  (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35, quoting *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera*).)  "[W]e accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial.' "  (*Aguilera*, at p. 1161.)

The only relevant inquiry is how a reasonable person in the suspect's position would have understood their situation.  (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 662.)  The Supreme Court has emphasized that the subjective perception of the suspect is not relevant.  (*Stansbury v. California* (1994) 511 U.S. 318, 323 (*Stansbury*).)  The high court has explained:  "[A]n objective test [is] preferable to a subjective test in part because it does not ' "place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question." ' "  (*Yarborough*, at p. 662.)

Nor is the undisclosed intent of the officers regarding the suspect's custodial status relevant.  (*Stansbury, supra*, 511 U.S. at p. 323.)  " '[A] policeman's unarticulated plan

17

has no bearing on the question whether a suspect was "in custody" at a particular time.' " (*Id.* at pp. 323-324.)  Furthermore, whether the person being interviewed is the focus of the investigation is not a relevant consideration.  (*Id*. at pp. 319, 324, 325 ["We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody"].)  Indeed, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."  (*Id.* at p. 325.)

California appellate courts have identified a number of factors to consider in the totality of the circumstances test.  (*Aguilera, supra*, 51 Cal.App.4th at p. 1162; accord, *People v. Torres* (2018) 25 Cal.App.5th 162, 172-173; *People v. Saldana* (2018) 19 Cal.App.5th 432, 455; *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404 (*Pilster*).)  These factors are:  (1) whether the contact with law enforcement was initiated by the police, and if so, whether the person voluntarily agreed to an interview; (2) whether the express purpose of the interview was to question the person as a witness or a suspect; (3) where the interview took place; (4) whether police informed the person that he or she was under arrest or in custody; (5) whether the police informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; (6) whether there were restrictions on the person's freedom of movement during the interview; (7) how long the interrogation lasted; (8) how many police officers participated; (9) whether police dominated and controlled the course of the interrogation; (10) whether the police manifested a belief that the person was culpable and they had evidence to prove it; (11) whether the police were aggressive, confrontational, and/or accusatory; (12) whether the police used interrogation techniques to pressure the suspect; (13) and whether the person

18

was arrested at the end of the interrogation.  (See, e.g., *Pilster*, at pp. 1403-1404., citing *Aguilera*, at p. 1162.)

"No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera, supra*, 51 Cal.App.4th at p. 1162.)  We do not focus solely on isolated statements made by the police during the interrogation.  The totality of the circumstances "must be considered as a whole." (*Pilster, supra*, 138 Cal.App.4th at p. 1403.)

C.      Analysis

Considering the *Aguilera* factors, we note the following:  it is undisputed that defendant came to the police station on his own.  His presence had not been requested by anyone.  Defendant returned to see Raya, the hotel manager, because defendant wanted to talk with him.  Defendant looked worried and sad.  Defendant said he had done "something wrong" and that "it was in reference to the event -- you know, to the investigation."  Raya suggested that he talk to the police.  Raya called the police.  Defendant was told at the outset that he was not under arrest, he was not required to speak to Detective Sentell if he didn't want to, and that if he wished to leave, he could leave at any time.  "And once he told [Sentell] we'd be done."

Thus, defendant was there at his own behest.  He was questioned by a single officer.  We have viewed a video of the interrogation.  Sentell was measured and courteous in his questioning.  Clearly, as he heard more from defendant, the questioning became more focused and accusatory and calculated to determine what defendant had done "wrong."  The fact that Sentell may have come to regard defendant as a suspect would not have altered his custodial status so long as the understanding declared at the beginning of the interview—that he could leave at any time—remained in place. Viewing the totality of the circumstances, there is no indication that Sentell decided to

19

make an arrest until later in the interrogation after defendant disclosed the criminal acts for which he was ultimately charged. In the end, defendant was arrested, but there was no indication of a preconceived plan to arrest at the beginning of the interview.

Defendant makes much of Sentell's act of placing his hand on defendant's knee and holding defendant's hand and his persistent pleas for honesty and candor. But measures designed to establish a level of comfort and trust are not forbidden. We agree with the trial court Sentell's tone was not threatening or intimidating. He touched defendant multiple times, but the touching appears intended to build trust, not to intimidate. Noncustodial questioning, expressions of doubt about a person's answers and persistence in following up on responses do not create an obligation to give *Miranda* warnings.

Beyond defendant's claim that his interrogation was involuntary because it was in response to questioning without *Miranda* warnings, there is no argument that the partial confession was otherwise coerced and there is no other obstacle to its admissibility

II

*Compelling Evidence Supports Guilt Even in Absence of Defendant's Admissions*

When she was interviewed at the hospital, the victim described her assailant as "a Hispanic male adult, about 5 foot 4 to 5 foot 6, approximately 18 to 22 years of age. . . . [H]e had a noticeable belly. He had short hair. She did not think he had facial hair but wasn't positive . . . . [H]e had an unknown colored T-shirt, khaki shorts, and a black belt."

Her roommate, M.K., reported that a Hispanic man with "a pot belly," had burst into the room the night of the attack. M.K. could not see the man's face but later told Detective Carlquist she "recognized [one of the hotel's employees] as possibly the suspect in the case, which made her very emotional." The man had visited the room the night before the attack, wearing blue jeans and a tan shirt "with a logo on the front" and had a nose ring. She recognized "the same movements or same gait" in the man who

20

burst into the room the night of the attack as the man who had come into the room the night before.

According to M.K. the hotel employee in question had come to the room the previous day. Detective Carlquist expounded on what she said as follows:

"She said that the day before, when they checked into the hotel, one of the employees, who she recognized as the employee who had just walked by, had come up to the room, had spoken with her and her friends and was acting very flirtatious. Said that if they needed anything at all, that he could take care of them. Said that they looked very good. Was acting out of character for his -- for his job there."

Upon ascertaining which male employees possibly matched the description of the victim's attacker, Detective Carlquist had the men assemble in the manager's office; one of the men was defendant. Carlquist said he "explained to the four employees," and Raya, the hotel manager, "that [the night before] there had been some sort of sexual assault or kidnapping possibly and that [the police] were investigating this." The four men were asked to give saliva samples; they all agreed to have the samples taken. Detective Carlquist also took pictures of the four men. A little while after Detective Carlquist had left, he was called by Raya. Raya told Carlquist that after the men had been dismissed to return to work, one of them, defendant, "had come back to him and appeared emotional and had said that he had done something bad [the night before]."

Serology samples obtained from the victim and defendant were examined. The examining criminalist found epithelial cells in the vaginal and genital swabs from the victim; however, no sperm cells were detected. By doing Y-STR testing "on the non-sperm fraction of the vaginal swab and the non-sperm fraction of the genital swab, [the criminalist] obtained a 17-locus male DNA haplotype." This profile matched defendant's DNA profile. According to the criminalist, this "means that [defendant] and all paternally related male individuals, barring a mutation, can't be excluded as a source of that DNA."

21

In addition to the 17-locus DNA haplotype, the criminalist found a "14-locus partial haplotype" in one of the victim's serological samples. The criminalist said that "even though I didn't see sperm cells when I made my slide, I still detected p30, which is a component of seminal fluid." The criminalist explained that "17-locus" means "a full haplotype. There is DNA at each marker, meaning that there is a full profile, a full haplotype."

This is not a case where defendant's guilt rests solely on his admissions under interrogation. His distinctive dress, nose ring and gait connected him to the room where the attack occurred. His self-admitted anxiety about doing something bad the night of the crime connected him to the events of that evening. DNA samples connected him to the victim. The evidence of guilt was compelling even in the absence of defendant's admissions under interrogation.

## DISPOSITION

The judgment is affirmed.

_____/s/_____
RAYE, P. J.

We concur:

_____/s/_____
HULL, J.

_____/s/_____
MAURO, J.